# EXHIBIT C

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA547176** |
|---|---|
| Filing date: | **07/08/2013** |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92057071 |
|---|---|
| Party | Plaintiff<br>David S. Beasley |
| Correspondence Address | DAVID S BEASLEY<br>1801 LAUREL ROAD, UNIT 612<br>LINDENWOLD, NJ 08021<br>UNITED STATES<br>dbea856005@aol.com |
| Submission | Motion to Amend Pleading/Amended Pleading |
| Filer's Name | Mr. David S. Beasley |
| Filer's e-mail | dbea856005@aol.com |
| Signature | /David S Beasley/ |
| Date | 07/08/2013 |
| Attachments | petition for cancellation-final.pdf(514364 bytes )<br>Ebony Document 1.pdf(1545326 bytes )<br>Ebony Document 2.pdf(2330300 bytes )<br>CERTIFICATE OF SERVICE.pdf(95841 bytes ) |

"IN THE UNITED STATES PATENT AND TRADEARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD,"

In the Matter of trademark Registration No. 4,170,469

For the Mark: The Ebonys

<u>Petitioner</u>
David S. Beasley
1801  Laurel Road Unit 612
Lindenwold, NJ   08021

       v.

<u>Registrant</u>
William H. Howard dba The Ebonys
104 S. Glenwood Avenue
Aldan, PA  19018-4016

Cancellation No. 92057071

**AMENDED PETITION TO CANCEL A TRADEMARK REGRISTRATION.**

David Beasley the petitioner believes that he will be damaged by the above-identified registration,

and hereby petitions to cancel the same.

The Grounds for Cancellation are as follows:

<u>Fraud</u>

- *Fraud in procuring a trademark registration occurs when an applicant knowingly makes false,
  material representations of fact in connection with the trademark application.*


1. The Ebonys were formed in 1969 by David Beasley/petitioner and consist of three vocalists

including himself; James Tuten (deceased) Clarence Vaughn and Jennifer Holmes.

2.  The Ebonys were officially signed with Assorted Music Records dba Philadelphia International

Records in January 1971 and continue to receive quarterly royalty statements.

3.  Registrant was not and is not an original member or performed on any original live recordings of

 The Ebonys singing/performing group.

4.  David Beasley/petitioner registered "The Ebonys" with the State of New Jersey as Class 041 in

1997.

5.  David Beasley/petitioner continues to manage goods and services involving the name "The Ebonys".  David Beasley/petitioner manages entertainment services  in the nature of live performances by vocalist; entertainment in the nature of vocal music groups; and live performances by musical groups.

6.  David Beasley/petitioner never relinquished in writing or verbally his rights of the "The Ebonys" name to registrant, any other individual and/or  group to provide profit to themselves for services or goods.

7.  David Beasley/petitioner continues with on-going projects as an original member/owner of the "The Ebonys".

By: <u>David S. Beasley</u>                                         Date:  <u>July  8, 2013</u>
       Petitioner



June 7, 1996


Artist Right Enforcement Crop
250 W. 57th Street
Suite 520
New York, New York


Mr. Chuck Rubin,

    I am a member of the former singing group The Ebonys.  Attached is a  copy of my contract that was signed in January 1971.   I have been referred to you by Bernie Wilson (The BlueNotes), to address the issue of royalties.

    Attached find a list of songs that were released but not apart of the album, along with songs that were on the album.

    I have been intouch with Clarence Vaughn & Jennifer Holmes Rossi in reference to contacting you (members).  They are interested in hearing from you.  If I can be of further assistance, please contact me.

    Thank you in advance for your time.  Looking forward to hearing from you in the near future.


David Beasley

attachments

ALBUM TITLE:      THE EBONYS

SIDE I                                          SIDE II

HOOK UP AND GET DOWN                            I'M SO GLAD I'M ME
IT'S FOREVER                                    I'LL TRY
LIFE IN THE CONTRY                              NATION TIME
SEXY WAYS                                       I BELIEVE
                                                YOU'RE THE REASON WHY

45 RELEASES

2 WRONGS DON'T MAKE A RIGHT
DETERMINATION
SORRY WE COULDN'T MAKE IT
CHRISTMAS JUST AIN'T CHRISTMAS (Without the One you Love)

Compact Disc has been released in the States, also Japan - 1995
See attached

Platinum Classic Recording has a Groove Me album with Ebony Recording on it.

## Ebony Members

Mr. Clarence Vaughn
728 Bentley Road
Lindenwold, NJ  08021
609-783-7135

Mrs. Jennifer Holmes Rossi
3753 King Avenue
Pennsauken, NJ  08105
609-663-8419

Mr. David Beasley
612 Timber Creek Condos
Lindenwold, NJ  08021
609-784-3037

Mr. James Tooten (deceased 1995)

# THE EBONYS

ジ・エボニーズ

## HOOK UP AND GET DOWN
フック・アップ・アンド・ゲット・ダウン   K. Gamble/L. Huff   3:26

## IT'S FOREVER
イッツ・フォーエヴァー   L. Huff   7:19

## LIFE IN THE COUNTRY
ライフ・イン・ザ・カントリー   L. Huff/Terry J. Conway   6:17

## SEXY WAYS
セクシー・ウェイズ   K. Gamble/L. Huff (idea)   3:08

## I'M SO GLAD I'M ME
アイム・ソー・グラッド・アイム・ミー   K. Gamble/L. Huff   3:03

## I'LL TRY
アイル・トライ   L. Huff (idea)/Gamble/Huff   6:13

## NATION TIME
ネイション・タイム   K. Gamble/L. Huff   4:59

## I BELIEVE
アイ・ビリーヴ   L. Huff   4:32

## YOU'RE THE REASON WHY
ユア・ザ・リーズン・ホワイ   K. Gamble/L. Huff   3:08

P-3510 Determination
P-3513 Without The One You Love
P-3514 Without The One You Love (Inst.)
P-3514 I'm So Glad I'm Me
P-3529 Do You Like The Way I Love
P-3541 I Believe
P-3803 You're The Reason Why
Nation Time
P-3548 Life In The Country
Hook Up And Get Down
Sony Ways





Distributed by Collectables Records, Box 35, Narberth, PA 19072   ©All rights reserved 1995
SEND FOR FREE CATALOG

## THE EBONYS - Golden Classics: Collectables 5659

The Ebonys have the distinction of scoring the first hit on Philadelphia International Records. The Camden, New Jersey, quartet was formed in the late '60s in their hometown, just across the Delaware River from Philadelphia. Initially restricted to playing local clubs, they got their big break when Leon Huff heard them perform.

Huff and his partner, Kenny Gamble, had already produced hits for artists like The Intruders and Jerry Butler. They had even tried to start a couple of their own labels, but were discouraged by the lack of promotion, especially after a bitter experience with Chess Records, which had handled their Neptune label.

Despite their problems with bigger companies, Gamble and Huff were still convinced their unique blend of funky rhythm and blues with sophisticated, highly orchestrated musical backgrounds could find a large audience. They finally signed with one of the biggest labels in the world, cutting a deal with Columbia Records in 1971 to distribute and market their Philadelphia International label.

The first few P.I. singles didn't set the charts on fire. But they did a lot better with Philadelphia International 3503. "You're The Reason Why" was written by Gamble and Huff and arranged by the accomplished Thom Bell. The dramatic ballad was a perfect vehicle for The Ebonys. It featured the haunting voice of Jennifer Holmes at the beginning of the song before she gave way to the rest of the group and their tormented emotionalism. Holmes, along with David Beasley, James Tuten and Clarence Vaughn, saw their powerful debut soar into the Billboard rhythm and blues Top 10 in the early summer of 1971. It also just missed the pop Top 50.

Gamble and Huff continued to work with their newest hitmakers, but subsequent singles didn't fare as well as their debut. The strong "Determination" (P.I. 3510) made it into the R&B Top 50 in late 1971. They did better with "It's Forever" (P.I. 3529), a classic soul ballad written by Leon Huff, that went to No. 14 on the R&B chart in the spring of 1973.

The group scored one more Philadelphia International hit. "Life In The Country" (P.I. 3548) went to No. 69 on the R&B charts in the fall of '74. Their one Philadelphia International album - "The Ebonys" - is the source for much of the material on this collection of their best work.

After leaving the Gamble-Huff operation, The Ebonys did score one more minor hit. They went to No. 83 in the fall of 1976 with "Making Love Ain't No Fun (Without The One You Love)" on Buddah 537.

After the hits slowed down The Ebonys drifted apart. But Jennifer Holmes did have another run of success as a member of the Philly-based quartet Creme D'Cocoa, which scored four hits in the late '70s for the Venture label. Their biggest success was "Doin' The Dog" (Venture 112), which went to No. 30 on the Billboard R&B chart.

While The Ebonys will always have the distinction of being the first hit act on Philadelphia International, it's clear from the material on this album that their success was no fluke. Jennifer Holmes and her three partners were fine singers and they did a very good job with the songs Gamble and Huff gave them. This is a tribute to the unique talent of both the singers and their producers.

--*MARK MARYMONT*

*Billboard chart numbers courtesy of Joel Whitburn's Record Research.*



SUPER HITS
INTRUDERS
INTRUDERS
SUPER HITS

NICE PRICE LINE 30

PHILADELPHIA
INTERNATIONAL RECORDS
SERIES

¥ 1,800 （税込）
好評発売中

THE EBONYS
THE EBONYS

HAROLD MELVIN & THE BLUE NOTES
HAROLD MELVIN & THE BLUE NOTES
ハロルド・メルヴィン ＆ ザ・ブルー・ノーツ

360 DEGREES OF BILLY PAUL
BILLY PAUL
360 ディグリーズ・オヴ・ビリー・ポール

IN PHILADELPHIA
THE O'JAYS
イン・フィラデルフィア／オージェイズ

8. I BELIEVE
アイ・ビリーヴ

9. YOU'RE THE REASON WHY
ユーア・リーズン・ホワイ

ベイビー― ベイビー― ベイビー
ベイビー― ベイビー― ベイビー
ベイビー― ベイビー― ベイビー



1973          THE EBONYS



THE EBONYS



TMSM-01

# NEW JERSEY DEPARTMENT OF STATE
## DIVISION OF COMMERCIAL RECORDING
## ORIGINAL APPLICATION TO REGISTER
## A TRADE OR SERVICE MARK

*This form may be used by applicants seeking to register a State trade or service mark pursuant to NJSA 36.  Applicants are responsible for strict adherence to all requirements set forth in State law.*  **(PLEASE REFER TO INSTRUCTIONS ON REVERSE SIDE)**

1. **Mark Type:  (check one)**  _____ Trade Mark  __XXXX__ Service Mark

2. **Name and Description of Mark:** (list the term that constitutes the mark or, in the case of a design mark, provide a brief description of its appearance)

   THE EBONY'S

3. **Description Of The Goods Or Services Involved:**

   ENTERTAINMENT/SINGING

4. **Classification Number(s):**  (Minimum of one)

5. **Applicant Information:**

   a.  Name:  DAVID S.  BEASLEY
   b.  Business Address:  612 TIMBERCREEK CONDOS
   LINDENWOLD, NJ  08021
   c.  Applicant is: (check one)  __xx__ An Individual ____ Corporation ____ Partnership ____ Other Business Entity
   d.  If applicant is a corporation, partnership or other business entity, list the home state:
   N/A
   e.  If applicant is a partnership, list the names of all general partners:
   N/A

6. **Assignee Information:**  (if applicable, provide assignee name/address)

   a.  Name:  N/A
   b.  Address:

7. **Dates:** Date First Used in New Jersey (must be entered) __1969__ Date First Used Elsewhere: __1969__

8. **Signature(s) and Statement of Ownership:**  (verification required)

The applicant attests that he or she is the owner of the mark, and that the mark is in use in this State, and that, to his or her knowledge, no other person has registered the mark, either with the US Patent and Trade Mark office or with the Secretary of State, or has the right to use the mark or a mark in such near resemblance as to be likely, when used in connection with the goods or services of such other person, to cause confusion, to to cause mistake, or to deceive.

_David Beasley_ _____   _5/6/97_ _____
(Signature of Applicant, or a Member of the Firm,   (Date)
or an Officer of the Corporation or Business Applying)

_____   _____
(Assignee, if Applicable)   (Date)

Subscribed and sworn to before me, _Rose D. Giuffre_, a Notary Public,
this __16th__ day of __May__ A.D. 19_97_ .

_Rose D. Giuffre_ _____   "ROSE D. GIUFFRE
(Notary Public)   Notary Public of New Jersey
   My Commission Expires 11/28/98"

*Note:  Attach to this application:  1) a drawing of the mark; and 2) three (3) specimens showing the mark as actually used.*

I, THE TREASURER THE STATE OF NEW JERSEY, DO HEREBY CERTIFY THAT

      DAVID S. BEASLEY
      612 TIMBER CREEK CONDOS
      LINDENWOLD  NJ  08021

DID ON THE 7TH DAY OF MARCH    A.D. 2003 FILE IN THIS DEPARTMENT
      SERVICE MARK
      MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :   041  EDUCATION AND ENTERTAINMENT

RENEWAL DATE:                    03/19/2013
EXPIRATION DATE:                 03/07/2018
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:           01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.



IN TESTIMONY WHEREOF, I HAVE
HEREUNTO SET MY HAND AND AFFIXED
MY OFFICIAL SEAL AT TRENTON, THIS
  19TH DAY OF    MARCH
A.D.    2013 .

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certificate Number:   127767183

Verify this certificate online at

http://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp





**Philadelphia
International
Records**

May 20, 2010


The Ebonys
c/o David Beasley
1801 Laurel Road
Lindenwold, NJ 08021


**Re: Royalty Statement for PE 12/31/09**


Mr. Beasley,

Enclosed please find the most current Ebonys Royalty Statement for *Period Ending December 31, 2009* for The Ebonys. Thank you for providing us the necessary contact information needed for future Ebonys royalty statements. Pursuant to our email and phone correspondence, it is our understanding that you are an official and legal representative of the group and are authorized to receive information on the group's behalf.

For any further questions, please give us a call at (215) 985-0900.



Sincerely,

Charles B. Gamble
Executive Vice President
Philadelphia International Records


Cc: Royalty Administration

**THE AVENUE OF THE ARTS**
215.985.0900 • Fax 215.985.1195
309 South Broad Street • Philadelphia PA 19107
www.gamble-huffmusic.com



ASSORTED MUSIC, INC.
250 South Broad Street
Philadelphia, Pennsylvania  19102

January 1, 1971

Messrs. David Beasley, Clarence
E. Vaughn, James Tuten and
Miss Jennifer Holmes
p/k/a "Ebonys"
c/o Gerald Wilson
403 Parry Road
Cinnaminson, New Jersey

Dear Sirs and Miss Holmes:

The following, when signed by you and us, will consti-
tute the agreement between you and us, pursuant to which you will
perform exclusively for us as a recording artist, upon the terms
and conditions herein set forth:

1.  This agreement shall commence as of the date Janu-
ary 1, 1971,    and shall continue in force for a term which shall
consist of an initial period of  one (1) year   from such date, and
the additional period or periods, if any, by which such term may
be extended through our exercise of one or more of the options
granted to us herein.

2.  During the term of this agreement, you will render
your services at recording sessions at studios selected by us, at
times and places to be designated by us, for the purpose of making
phonograph records.  The musical compositions to be recorded shall
be designated by us, and each master recording made hereunder shall
be subject to our approval as satisfactory for the manufacture
and sale of records.  During the initial period of the term hereof,
you will perform for the recording of satisfactory master record-
ings which shall consist of a minimum of   four (4)      45 r.p.m.
sides, or their equivalent, and we will record your performances.
Additional master recordings shall be performed by you and recorded
by us at our election.

-2-

3.  During the term of this agreement you will not
perform for the purpose of making phonograph records or master
recordings for any person other than us, and during a period of
five (5) years after the expiration of the term of this agree-
ment, for any reason whatsoever, you will not perform any musi-
cal composition which shall have been recorded hereunder for any
person other than us for the purpose of making phonograph records
or master recordings.  It is agreed between you and us that your
services to be rendered hereunder are of a special, unique,
unusual, extraordinary and intellectual character, involving
skill of the highest order, which gives them a peculiar value,
the loss of which cannot be reasonably or adequately compensated
by damages in an action at law, and that your breach of any of
the provisions contained in this agreement shall cause us irrep-
arable damage and injury.  You hereby expressly agree that we
will be entitled to injunctive relief and other equitable relief
to prevent or cure any breach or threatened breach of this agree-
ment by you.

4.  All master recordings recorded hereunder and all
matrices and phonograph records manufactured therefrom, together
with the performances embodied thereon, shall be entirely our
property, free from any claims whatsoever by you or any person
deriving any rights or interests from you.  Without limiting the
generality of the foregoing, we and/or our subsidiaries, affili-
ates and licensees shall have the unlimited right, from time to
time, to manufacture by any method now or hereafter known phono-
graph records and other reproductions on any mediums or devices
now or hereafter known, of the master recordings made hereunder,
and to sell, transfer or otherwise deal in the same throughout
the world under any trademark, trade name and label, or to re-
frain from such manufacture, sale and dealing.

5.  At our election, all compositions recorded pursuant
to this or any other agreement between you and us which are
written or composed by you or owned or controlled by you or any
party which is allied or affiliated with you or in which you
have a direct or indirect interest, shall be licensed to us at
a royalty rate of 1-1/2          cents per 45 r.p.m. record side, or
its equivalent, on the basis of Ninety (90%) Per Cent of net
sales of records, except that (i)  with respect to records sold

-3-

and/or distributed as "bonus" or "free" records through "Club Operation" (as defined in sub-paragraph 8 (b) of this agreement), the royalty rate shall be three-fourths (3/4ths) of the rate set forth above, payable on the basis of Ninety (90%) Per Cent of net sales of records; and (ii) no copyright royalties shall be payable with respect to records described in sub-paragraph 8 (f) hereof. Arranged versions of musical compositions in the public domain, when furnished by you or any party described above for recordings hereunder, shall be free of copyright royalties. Any assignment made of the ownership or copyright in any such composition or in any such arranged version of a musical composition in the public domain shall be made subject to the provisions hereof. In the event we are required to pay mechanical copyright royalties in excess of those provided in this Paragraph 5, we shall have the right to charge such excess against all royalties or other sums payable to you hereunder.

6. (a) For your services rendered hereunder, and for the rights granted herein to us, we will make a non-returnable payment to you, within fourteen (14) days after the services are rendered at each recording session, at the rate of union scale; and each such payment shall constitute an advance and shall be charged against your royalties under this and/or any other agreement between you and us, if and when earned. Without limiting the generality of the foregoing, included amont payments which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreement between us and any union representing you for performances hereunder.

(b) We shall specify your accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals in respect of master recordings made hereunder, and we shall pay the costs of such accompaniment as well as the costs of such arrangements and copying and studio charges and/or rentals which are specifically undertaken in respect of such master recordings (such costs are hereinafter collectively referred to as "Accompaniment Costs"); and all such Accompaniment Costs so paid by us shall constitute advances and shall be charged against your royalties earned. Without limiting the generality of the foregoing, including among Accompaniment Costs,

which shall hereunder constitute advances chargeable against royalties, shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreements between us and any union representing other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals for performances hereunder.

7.   (a)  We will pay you a basic royalty of (i) Six (6%) Per Cent of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely on both sides thereof a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee to whom we have supplied a copy or duplicate of a master or a matrix of or embodying such composition or compositions; and (ii)  one-half (½) of such percentage of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely of such composition or compositions on only one side thereof, so manufactured and sold.  In computing the number of records manufactured and sold hereunder, we shall have the right to deduct returns and credits of any nature, including, without limitation, those on account of One Hundred (100%) Per Cent return privileges, defective merchandise, exchange privilege, promotional credits, error in billing, usable overstock and error in shipment.

(b)  Royalties for records sold for distribution outside of the United States of America shall be computed in the national currency, at our election, of the country of manufacture, the country of sale of the United States of America, and as to sales made for distribution outside of the United States of America, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold for distribution outside of the United States of America shall not be due and payable until payment therefor has been received by us in the United States of America, and provided further, that if we do not receive payment in United States dollars currently and elect to accept payment in a foreign currency, we may deposit to your account (and at your expense) in such currency in a depository selected by us, all payments so received as royalties applicable to this agreement, and shall notify you thereof promptly.  Such deposit, as above stated, shall fulfill our obligation hereunder

as to record sales to which such royalty payments are applicable.

(c) With respect to any master recording embodying your performance hereunder, together with the performance of another artist or artists to whom we are obligated to pay royalties in respect of phonograph records embodying the joint performances contained on such master recording:

(i) the royalty rate to be used in determining the royalties payable to you in respect of such master recording shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on such master recording; and

(ii) in determining the portion of the Accompaniment Costs applicable to such master recording which shall be charged against your royalties if and when earned, such portion shall be computed by multiplying the aggregate amount of such Accompaniment Costs by the same fraction used in determining the royalties payable to you in respect of such master recording.

(d) With respect to a side of a long-playing (33-1/3 r.p.m.) or extended-play microgroove record, which embodies on such side performances contained on another master recording(s) in addition to the performances contained on a master recording(s) recorded hereunder, the royalty payable to you in respect of such record side shall be computed by basing the rate provided in sub-paragraph 7(a) (ii) (or other applicable rate) upon that proportion of the applicable wholesale price (less all taxes) of such record that the number of 45 r.p.m. sides required to embody your performances recorded hereunder on such record side bears to the total number of 45 r.p.m. sides required to embody the total number of performances on such record side.

(e) With respect to all phonograph records sold hereunder, royalties on phonograph records included in albums, jackets, cartridges, cassettes, boxes or any other type of package or container (herein collectively referred to as "container(s)") shall be

based solely upon the applicable wholesale price of such phonograph records in containers less all taxes and also less a container charge not to exceed Ten (10%) Per Cent of the applicable price of disc phonograph records and Twenty-five (25%) Per Cent with respect to all other forms of records as defined in sub-paragraph (e) (i) or (e) (ii), as the case may be, of Paragraph 16 hereof.

8.   Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any other such agreement and sold and/or distributed in the manner set forth hereinbelow:

(a)   In respect of phonograph records sold for distribution outside of the United States of America, the royalty rate payable to you therefor shall be equal to one-half (½) of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States of America.

(b)   In respect of phonograph records sold through any direct mail order operation or through any direct sales-to-consumer operation carried on by us, our subsidiaries, affiliates or licensees including, without limitation, any Record or Tape Club (herein collectively referred to as "Club Operation"), the royalty rate shall be one-half (½) of the otherwise applicable royalty rate.  Notwithstanding the preceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of One ($1.00) Dollar or less, the royalty rate payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than One ($1.00) Dollar and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges). Notwithstanding anything contained in the foregoing two sentences or elsewhere in this agreement, no royalty shall be payable to you with respect to (i)  phonograph records which are received

by members of any such Club Operation, either in an introductory offer in connection with such Club Operation or upon recommending that another join such Club Operation and/or as a result of the purchase of a required number of records, including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

(c) In respect of phonograph records sold to our clients for promotional, sales incentives or educational purposes or phonograph records sold to educational institutions or libraries, the royalty rate payable to you therefor shall be one-half (1/2) the royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

(d) In respect of phonograph records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be one-half (1/2) of the applicable royalty rate otherwise payable if such record(s) were sold in disc form.

(e) In respect of phonograph records sold on a "low-price" or "budget" label, the royalty rate shall be one-half (1/2) the applicable rate otherwise payable.

(f) No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no-charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

9. In respect of the royalties provided for herein:

(a) We will compute royalties payable to you hereunder within sixty (60) days after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6)-month period, and will render accountings for and pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such sixty (60) days, except as provided in sub-paragraph 7(b) hereof, and except with respect to sales of records upon which royalties are payable to us by a distributor thereof. We shall be responsible for payment of your royalties on such sales only after receipt by us from such distributor of the royalties applicable to such sales.

-8-

(b)   All royalty statements and all other accounts rendered by us to you hereunder shall be binding upon you and not subject to any objection by you for any reason whatsoever, unless specific objection in writing, stating the basis thereof, is given to us within six (6) months from the date rendered. Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of Fifty ($50.00) Dollars or less, unless we receive a written demand from you for such an accounting and payment.

10.   (a)   We shall have the right to use and to allow others to use your name and likeness and biographical material concerning you for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products.   We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent.   During the term of this agreement, you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

(b)   Without limiting the provisions of sub-paragraph 10(a) hereof, you hereby grant to us, during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively referred to as "sale(s)") of merchandising rights and to enter into agreements covering such sales.   It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof, but after the termination of the term of this agreement, we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement.   For the rights granted by this sub-paragraph we will pay you, in United States dollars, Fifty (50%) Per Cent of the net monies earned and received by us in the United States of America from such sales of merchandising rights authorizing the use of your name and/or likeness and/or biographical material concerning you pursuant to this agreement.

-9-

(c)  You warrant and represent that you own all rights in and to the name "Ebonys" (hereinafter referred to as the "Name"), and that you have the sole and exclusive right to use and to allow others to use the Name in connection with the manufacture, advertising and sale of phonograph records. You hereby grant to us, and further warrant and represent, that we shall have the right to use and to allow others to use the Name for advertising and purposes of trade and otherwise without restriction in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artist and products and exclusively in connection with the merchandising rights to the same extent and on the same terms and conditions as set forth herein with respect to your names. It is understood and agreed that (i) during the term of this agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) for the purpose of making phonograph records for any person other than us, and (ii) during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) of any compositions recorded hereunder for any person other than us for the purpose of making phonograph records. It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i) the performances by any person or persons rendered during the term of this agreement, or (ii) the performance by any person or persons of a composition recorded hereunder rendered within five (5) years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with the Name or any name substantially similar thereto. You acknowledge that any use of the Name (or any name substantially similar thereto) contrary to the provisions hereof would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

(d)  In the event that during the term of this agreement any artist shall leave the group hereunder identified with the Name and/or shall cease to perform as a member of such group, you shall promptly give us notice in writing to such effect and in the event we shall deem it advisable, such leaving member shall be replaced by a new member who shall be mutually acceptable; and the

-10-

name of such new member shall thereafter be deemed substituted in
this agreement in the place of such leaving member, and such new
member, by performing hereunder, shall automatically be bound by
all the terms and conditions of this agreement. Upon our request
therefor, the remaining members of the group will duly cause any
such new member to execute and deliver to us such document as we,
in our judgment, may deem necessary or expedient to carry out or
effectuate the purpose or intent of the foregoing sentence. Such
leaving member shall thereafter be relieved from further perform-
ances hereunder with the group, but shall continue to be bound
individually by the applicable provisions of this agreement in-
cluding, without limitation, the provisions set forth in sub-
paragraphs 10(e) and 3 hereof.

(e) You warrant and represent that, in the event
any one or more of the artists shall so leave the group as pro-
vided in sub-paragraph 10(d) hereof, we shall have, and you and
each of you does hereby grant to us, and irrevocable option on
your individual and exclusive services for the purpose of making
phonograph records. Such option, with respect to any such leav-
ing member, may be exercised by us by giving such leaving member
notice in writing within ninety (90) days after our receipt of
the notice provided for in said sub-paragraph 10(d); and, in the
event of our such exercise of option, such leaving member shall
execute our then current standard form of term recording contract
containing the following provisions:

(i) a term consisting of not less than the
remaining balance of the term of this agreement as it may be ex-
tended by our exercise of the options granted to us herein;

(ii) a minimum of   four (4)       45 r.p.m.
record sides or their equivalent for which satisfactory master re-
cordings will be performed and recorded during each year of such
term, it being understood and agreed that if the remaining balance
of the term of this agreement shall be less than six (6) months,
then the minimum number of such 45 r.p.m. record sides for which
master recordings will be performed and recorded during such re-
maining balance of the term shall be one-half (½) of the foregoing
number;

(iii) a royalty in respect of phonograph re-
cords embodying performances recorded during such term at the rates
set forth in Paragraphs 7 and 8 of this agreement; and

-11-

(iv) a payment for services rendered at each recording session at the rate of union scale, which payment shall constitute advances chargeable against such royalties.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this sub-paragraph 10(e) shall be applicable with respect to each member of the group.

(f) As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent. Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several and all references herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.

11. You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(a) any performance rendered by you during the term of this agreement; or

(b) any performance rendered by you within five (5) years after the expiration of the term of this agreement of a composition which shall have been recorded pursuant to this agreement.

You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances. Specifically, without limiting the generality of the foregoing, you agree:

(a) if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or soundtracks for motion picture films; or

(b) if, within five (5) years after the expiration of the term of this agreement you perform for any such purpose any composition which shall have been recorded pursuant to this agree-

-12-

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records.

You will promptly furnish to us, at our Philadelphia office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

12.  You warrant and represent that you are under no disability, restriction or prohibition in respect of (a)  your right to execute this agreement and perform its terms and conditions, and more particularly, (b)  your right to perform for the recording of any and all compositions hereunder, except to the extent, if any, set forth in Schedule I attached hereto and made a part hereof.  You agree to and do hereby indemnify, save and hold us harmless from loss or damage (including reasonable attorneys fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this agreement.  You will reimburse us on demand for any payment made by us at any time after the date hereof in respect of any liability or claim to which the foregoing indemnity relates.

13.  We may, at our election, assign this agreement or any of our rights hereunder.

14.  (a)  You warrant and represent that you are now a member in good standing of the American Federation of Television and Radio Artists, or will become a member within thirty (30) days after your first engagement with us, and that you will remain so during the term of this agreement.

(b)  The provisions of the AFTRA National Code of Fair Practice for Phonograph Recordings are made a part of this agreement with the same force and effect as if fully set forth herein.

(c)  If, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of Paragraph 2 hereof or, if due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within our control, or which we could not, by reasonable

-13-

diligence, have avoided, we are materially hampered in the record-
ing, manufacture, distribution or sale of records, or our normal
business operations become commercially impractical, then, without
limiting our rights in any such event, we shall have the option,
without liability, to suspend operation of Paragraph 2 and/or sub-
paragraph 9 (a) of this agreement for the duration of any such con-
tingency by giving you written notice thereof; and at our election,
a period of time equal to the duration of such suspension shall be
added at the end of the then current period of the term hereof, and
then such period and the term of this agreement shall be accordingly
extended.

15.  If, during the term of this agreement we fail, ex-
cept for reasons set forth in Paragraph 14 hereof, to record master
recordings constituting the minimum number of record sides provided
for herein and, if within thirty (30) days after the expiration of
the term hereof you shall notify us by registered mail of your re-
quest that we record such of your performances as well as fulfill
our minimum obligation hereunder, then we shall, at our option, with-
in sixty (60) days after our receipt of such request, either record
such performances or pay you at the rate of union scale in full set-
tlement of our obligation in connection therewith.  In the event
that you do not so notify us within such thirty (30)-day period,
then we shall be under no obligation to you for failure to record
master recordings constituting such minimum number of record sides.

16.  For purposes of this agreement:

(a)  "Master recording" means any original recording,
whether on magnetic tape or wire, a laqueur or wax disc, or on any
other substance or material, whether now known or unknown, which
is used in the manufacture of phonograph records;

(b)  "Matrix" means any dye or mold or device which
is now or hereafter used, directly or indirectly, in the manufac-
ture of phonograph records and which is made from master recordings;

(c)  "Person" or "party" include any individual, corp-
oration, partnership, association or other organized group of per-
sons or legal successors or representatives of the foregoing;

(d)  "Records", "phonograph records" and "recordings"
mean and include all forms of recording and reproductions, now known
or which may hereafter become known, manufactured or sold primarily

-14-

for home use and/or jukebox use and/or use on transportation facilities, including, without limiting the generality of the foregoing, magnetic recording tape, film and any other medium or device for the reproduction of artistic performances manufactured or sold primarily for home use and/or jukebox use and/or use on transportation facilities, whether embodying:

(i)   sound alone; or

(ii)   sound synchronized with visual images, e.g., "sight and sound" devices;

(e)   "Wholesale price" means:

(i)   With respect to records sold hereunder for distribution in the United States of America, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of the royalties to be made pursuant to sub-paragraph 9 (a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us; and

(ii)   With respect to records sold hereunder for distribution outside the United States of America, one-half (½) of the suggested retail list price or applicable list price (less container charges and local taxes, if any), as the case may be, of such records in, at our election, the country of manufacture, the United States of America or the country of sale;

(f)   "Records sold" shall mean records shipped, paid for and not returned or exchanged.  In the event records hereunder are shipped subject to a discount or merchandising plan, the number of records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of discount granted. In the event a discount is granted in the form of "free" or "bonus" merchandise, such "free" or "bonus" merchandise shall not be deemed included in the number of records sold.  "Records sold" shall not include records given away or distributed for Fifty (50%) Per Cent or less of the regular wholesale price to distributors or others for promotion or exploitation purposes in connection with the inducement of sale of other records hereunder.

(g)   "Merchandising rights" shall mean and include all rights with respect to printed material, endorsements and merchandising of commercial tie-ups, in connection with the manufacture, advertising and sale of physical property, including without limitation, toys, novelties, books, paper cut-outs, activity books, etc.; an

(h)   As used in sub-paragraph 10(b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 10(b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we may be required to pay, as expenses, commissions or otherwise, to third persons in connection with such sales, all of which are to be computed in accordance with our standard accounting practices and procedures.

(i)   As used herein, "low-price" or "budget" labels shall mean any label used by us, our subsidiaries, affiliates, distributors or licensees, signifying that the records bearing such label carry a suggested retail list price substantially lower than the suggested retail list price for records bearing the standard label or labels used by us, our said subsidiaries, affiliates, distributors and/or licensees.

17.   No failure by us to perform hereunder, and no act or failure to act shall be deemed a material breach of this contract unless you shall first deliver to us, and to the record company principally distributing your recordings in the United States, a written notice specifying the alleged failure to perform or the alleged act or alleged failure to act constituting such material breach, and we shall have failed to cure any such material breach within thrity (30) days after receipt by us of such notice from you.   In the event we do not cure any such breach within the said thirty (30)-day interval, then it is specifically understood and agreed that this contract may be assigned to the said record company distributing your recordings in the United States, and such record company shall have an additional thirty (30)-day period to cure the said material breach in such event.

18.   Any option to extend the term of this agreement, as hereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least ten (10) days prior to the expiration of such term.   Such notice to you may be given by delivery to you by mailing to you at your address last known to us.   Such notice by mail shall be deemed to have been given on the date on which it is mailed.

-16-

19.  You grant to us the option to extend the term of
this agreement for a first additional period of one year upon all
the terms and conditions herein contained, except that in respect
of compositions performed by you and recorded by us during such
period, the royalty rate set forth in Paragraph 7(a) hereof shall
be    Seven (7%)        Per Cent in lieu of the rate therein set
forth, and the minimum number of sides shall be   eight (8).

20.  If we have exercised the option granted in Paragraph
19 hereof, we shall have another option to extend the term of this
agreement for a second additional period of one year upon all the
terms and conditions herein contained, except that in respect of
compositions performed by you and recorded by us during such addi-
tional period, the royalty rate set forth in Paragraph 7(a) hereof
shall be    Eight (8%)       Per Cent in lieu of the rate therein
set forth, and the minimum number of sides shall be eight (8).

21.  If we have exercised the option granted in Paragraph
20 hereof, we shall have another option to extend the term of this
agreement for a third additional period of one year upon all the
terms and conditions herein contained, except that in respect of
compositions performed by you and recorded by us during such addi-
tional period, the royalty rate set forth in Paragraph 7(a) hereof
shall be    Nine (9%)        Per Cent in lieu of the rate therein
set forth, and the minimum number of sides shall be   eight (8).

22.  If we have exercised the option granted in Paragraph
21 hereof, we shall have another option to extend the term of this
agreement for a fourth additional period of one year upon all the
terms and conditions herein contained, except that in respect of
compositions performed by you and recorded by us during such addi-
tional period, the royalty rate set forth in Paragraph 7(a) hereof
shall be    Ten (10%)        Per Cent in lieu of the rate therein
set forth, and the minimum number of sides shall be   eight (8).

-17-

23.  We shall have the sole and exclusive control of the distribution of phonograph records produced hereunder and shall have the right to distribute, market and exploit the same directly or through any subsidiary, affiliate or licensee of ours or through any franchise holder, distributor, licensee or other person throughout the world.

24.  It is acknowledged and agreed that certain recording costs and advances have not been recouped pursuant to a prior agreement with you with respect to which a release dated the 31st day of December   , 1970, has been negotiated and executed by the parties thereto.  It is agreed that the amount of such recording costs and/or advances, to the extent not recouped pursuant to the said prior agreement, shall be deemed an advance against and recoupable from any and all royalties payable pursuant hereto.

25.  This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any other provision thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of or default under this agreement shall affect our rights or remedy in the event of any other default, whether or not similar.  The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of New York.

Very truly yours,

ASSORTED MUSIC, INC.

ACCEPTED AND AGREED:

_David Beasley_
David Beasley

By _Leon Huff_

_Clarence E. Vaughn_
Clarence E. Vaughn

Parent or Guardian _William Vaughn Sr._

_James Tuten_
James Tuten

Parent or Guardian _Mrs Jennie Holmes_

_Jennifer Holmes_
Jennifer Holmes
p/k/a "Ebonys"

Parent or Guardian_____

Parent Or Guardian_____

## CERTIFICATE OF SERVICE

Amended petition to cancel a trademark registration
Cancellation #92057071
July 8, 2013

Registrant
Mr. William H. Howard
104 So. Glenwood Avenue
Aldan, PA  19018-4016

Email address
Whoward123@comcast.net