# EXHIBIT E

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA838071** |
|---|---|
| Filing date: | **08/07/2017** |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92066369 |
|---|---|
| Party | Defendant<br>William H. Howard DBA The Ebonys |
| Correspondence<br>Address | WILLIAM H HOWARD<br>104 S GLENWOOD AVE<br>ALDAN, PA 19018<br>UNITED STATES<br>Email: whoward123@comcast.net |
| Submission | Motion for Summary Judgment<br><br>**Yes**, the Filer previously made its initial disclosures pursuant to Trademark Rule 2.120(a); OR the motion for summary judgment is based on claim or issue pre-clusion, or lack of jurisdiction.<br><br>The deadline for pretrial disclosures for the first testimony period as originally set or reset: **10/06/2017** |
| Filer's Name | Moshe D. Lapin |
| Filer's email | moshe@lapinlegal.com |
| Signature | /MDL/ |
| Date | 08/07/2017 |
| Attachments | THE EBONYS Motion for Summary Judgment with Exhibits.pdf(5804342 bytes ) |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| David S Beasley | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| Vs. | ) | Cancellation No. 92066369 |
| | ) | |
| William H. Howard DBA The Ebonys | ) | |
| | ) | |
| Registrant. | ) | |
| _____ | ) | |

**MOTION FOR SUMMARY JUDGMENT**
**BASED UPON**
**RES JUDICATA AND COLLATERAL ESTOPPEL**

Pursuant to Rules 56 of the Federal Rules of Civil Procedure and Trademark Trial and

Appeal Board Manual of Procedure ("T.B.M.P.") 528, Registrant William H. Howard

("Registrant"") hereby moves the Board for an order DISMISSING the Petition for Cancellation

in favor of Registrant based on Res Judicata and Collateral Estoppel.

A Motion for Summary Judgment is generally improper prior to disclosures. However,

because the basis for this motion is issue and claim preclusion, this motion is timely filed.

_Unrock Network, LLC v. Sulpasso_, 115 USPQ2d 1409, 1410 n.5 (TTAB 2015) (motion to

dismiss considered as one for summary judgment where it asserts claim preclusion); _Compagnie_

_Gervais Danone v. Precision Formulations LLC_, 89 USPQ2d 1251, 1255 n.7 (TTAB 2009) ("if a

party moves for summary judgment prior to the deadline for making initial disclosures it should

indicate in its motion that the disclosures have been made, or are not required because the motion

1

seeks judgment on claim or issue preclusion or on a jurisdictional issue"); *NH Beach Pizza LLC v. Cristy's Pizza Inc.*, 119 USPQ2d 1861, 1862 n.1 (TTAB 2016) (construing motion to dismiss filed in lieu of answer as motion for summary judgment on issue preclusion).

## I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT

Petitioner's Petition for Cancellation in this Cancellation No. 92066369 (the "Cancellation Petition") should be dismissed because the claims and issues raised in this proceeding have already been fully and finally adjudicated against Petitioner.  The Petitioner has already had his day in court – and lost. The instant Cancellation Petition raises the same issues and claims that were (or should have been) previously raised in *David S. Beasley v. William H. Howard DBA The Ebonys*, Cancellation No. 92057071 (hereinafter the "Prior Action").[1] The parties in this proceeding are *identical* to the parties in the Prior Action; the trademark at issue here is the *identical* trademark at issue in the Prior Action; and the issues and claims raised in this proceeding are identical to those issues and claims that were (or should have been raised) in the Prior Action.

Attached as Exhibit A is the Boards final decision in the Prior Action; attached as Exhibit B is Petitioner's Amended Petition in the Prior Action; attached as Exhibit C is the evidence submitted by Petitioner in the Prior Action; attached as Exhibit D is Petitioner's "Motion for Cancellation" in the Prior Action; and attached as Exhibit E is Petitioner's final brief in the Prior Action. All the exhibits are incorporated by reference, and all contain evidence directly relevant to the question of claim and issue preclusion, especially to the scope of the "transactional facts"

---

[1] Registrant requests that the Board take judicial notice of the documents of record in the Prior Action. *Ambase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (taking judicial notice of court records to determine res judicata effect of earlier action); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *Rene v. Jablonski*, 2009 WL 2524865, at *8 (E.D.N.Y. Aug. 17, 2009) ("Furthermore, in evaluating the res judicata effect of a prior action, 'courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related findings'").

in the Prior Action. The exhibits clearly show that the claims made by Petitioner in this proceeding arise from the same transactional facts alleged in the Prior Action.

Unlike issue preclusion, the doctrine of claim preclusion is also available where a claim *could have* been raised in the prior action. See *Pactiv Corp. v. Dow Chem. Co.*, 78 USPQ2d 1939, 1941; *Urock Network, LLC v. Sulpasso*, 115 USPQ2d 1409, 1412 (TTAB 2015) (claim preclusion extends to relitigation of "claims that were raised *or could have been raised* in an earlier action" (quoting *Allen v. McCurry*, 449 US 90, 94 (1980) (emphasis added)); *Bacardi & Co. Ltd. v. Ron Castillo, S.A.*, 178 USPQ 242, 244 (TTAB 1973); see also *Vitaline Corp. v. General Mills Inc.*, 891 F.2d 273, 13 USPQ2d 1172, 1173-74 (Fed. Cir. 1989). see also *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."); *Aspex Eyewear Inc. v. Marchon Eyewear Inc.*, 101 USPQ2d 2015, 2020 (Fed. Cir. 2012) ("claim splitting is forbidden by the principles of res judicata."); *Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, 23 USPQ2d 1134, 1138 (TTAB 1992).

Even if a cause of action raised in this proceeding was not raised in the Prior Action, there is no genuine issue that Petitioner's claims in this proceeding are based on the same transactional facts as, and could have been litigated in, the Prior Action. Accordingly, claim preclusion applies to all the claims made in this proceeding. See *Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368, 1370 (Fed. Cir. 2006) (where second claim is based on the same transactional facts as the first, claim should have been raised in the previous proceeding). Moreover, the Board already ruled in the Prior Action that "[s]ince no other grounds were pursued nor pleaded with particularity, we consider any such grounds to have been

3

waived." TTAB Decision in *David S. Beasley v. William H. Howard DBA The Ebonys*, Cancellation No. 92057071, Footnote 2.

Now, after Petitioner was soundly defeated in the Prior Action, he is attempting to breathe life back into this Cancellation. As Chief Judge Alex Kozinski of the Ninth Circuit Court of Appeals recently stated, "At some point, litigation must come to an end. That point has now been reached."[2] That sentiment applies with powerful force here. As the law and common sense dictate, this Cancellation proceeding must be dismissed.

## II.   FACTUAL AND PROCEDURAL HISTORY

On April 18, 2013, in the Prior Action, Petitioner filed his first Petition for Cancellation of the identical registration at issue here, also against the identical Registrant William H. Howard DBA The Ebonys. In his Petition in the Prior Action, Petitioner alleged a range of grounds for cancellation, including the fact that "William Howard is not a [sic] original member or on any original recording of the Ebonys singing/performing group that was formed in 1969. William Howard should not perform or record under this name. (The Ebonys/Ebonys)." After the Board notified Petitioner that the Petition did not conform with the TTAB requirements, Petitioner filed an Amended Petition to Cancel on July 8, 2013 (the "Amended Petition"). See Exhibit B. The Amended Petition set forth the following allegations:

1. The Ebonys were formed in 1969 by David Beasley/petitioner and consist of three vocalists including himself; James Tuten (deceased) Clarence Vaughn and Jennifer Holmes.

2. The Ebonys were officially signed with Assorted Music Records dba Philadelphia International Records in January 1971 and continue to receive quarterly royalty statements.

_____

[2] *Facebook, Inc. v. Pac. Northwest Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011).

3. Registrant was not and is not an original member or performed on any original live recordings of The Ebonys singing/performing group.

4. David Beasley/petitioner registered "The Ebonys" with the State of New Jersey as Class 041 in 1997.

5. David Beasley/petitioner continues to manage goods and services involving the name "The Ebonys". David Beasley/petitioner manages entertainment services in the nature of live performances by vocalist; entertainment in the nature of vocal music groups; and live performances by musical groups.

6. David Beasley/petitioner never relinquished in writing or verbally his rights of the "The Ebonys" name to registrant, any other individual and/or group to provide profit to themselves for services or goods.

7. David Beasley/petitioner continues with on-going projects as an original member/owner of the "The Ebonys".

*Id.* The allegations were further developed by Petitioner in its evidentiary submissions in the Prior Action (see Exhibit C) and in its briefs (see Exhibits D and E).

In addition to alleging the above listed facts, the Petition also alleged in the Amended Petition that Registrant committed "fraud in in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with the trademark application." *Id.*

In the Prior Action, Petitioner, in addition to other evidence, submitted a state service mark registration issued by the State of New Jersey for "The Ebonys," listing Petitioner as owner, with the filing date listed as March 7, 2003; a Management contract between

Petitioner, as "Owner of The Ebonys," and Forrest Finney and Michael Mackintosh, dated October 1, 2007; and a flyer advertising a concert by Ebony's Revue. See Exhibit B.

On December 9, 2014, the Board, after reviewing the pleadings and evidence, dismissed the Petition for Cancellation. See Exhibit A.

Two and half years after the Board dismissed Petitioner's Prior Action, Petitioner again filed a Petition for Cancellation against Registrant on the same trademark on June 28, 2017. The grounds for cancellation are again identified as fraud on the USPTO, the same issue and claim raised in the Prior Action which the Board reviewed and dismissed. Paragraphs 10 through 18 of the instant Petition for Cancellation are allegations relating to the fraud issue – already decided by the Board in the Prior Action.

Though not listed in his coversheet, Paragraphs 1 through 9 of the instant Cancellation Petition allege that the trademarks are confusingly similar. Comparing the allegations in the instant Petition with the Amended Petition and evidence submitted in the Prior Action, it is obvious that there is no genuine issue that claims made in the instant Petition are based on the same transactional facts as those raised previously, and should have clearly been raised in the Prior Action. Petitioner is merely calling the same thing by a different name. "Claim preclusion, where found, operates to bar subsequent assertion of the same transactional facts in the form of a different cause of action or theory of relief. Generally, this principle rests on the assumption that all forms of relief could have been requested in the first action." *Young Eng'rs, Inc. v. United States ITC*, 721 F.2d 1305, 1314 (Fed. Cir. 1983); *Aspex Eyewear Inc. v. Marchon Eyewear Inc*., 101 USPQ2d 2015, 2020 (Fed. Cir. 2012) ("claim splitting is forbidden by the principles of res judicata.").

The Board's language in its *Orouba Agrifoods Processing Company v. United Food Import* (Cancellation No. 92050739) decision just as easily could have been written about this case:

> Finally, there is no genuine issue that petitioner's claims in this proceeding are based on the same transactional facts as, and could have been litigated in, the prior opposition. Indeed, the prior opposition, like this proceeding, is based on petitioner's allegations of ownership and use of [its trademark]. Here, while the grounds for the prior opposition did not include priority and likelihood of confusion, false suggestion of a connection or misrepresentation of source, **all of these claims are based on the same facts alleged in the opposition, perhaps with slightly more detail**.

*Id.* (Emphasis added).

### III.   LEGAL STANDARD

A party is entitled to summary judgment when it has demonstrated that there are no genuine issues as to any material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Coro. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986).

The Federal Courts and the TTAB have recognized that "summary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action. *Sweats Fashion Inc. v. Pannill Knitting Co*., 833 F.2d 1560, 1562 (Fed. Cir. 1987); see *Turner Entm't Co. v. Nelson*, 38 U.S.P.Q.2d 1942, 1944 (TTAB 1996) ("the purpose of summary judgment is one of judicial economy, that is, to save the time and expense of a useless trial.").

### IV.   CANCELLATION PETITION IS BARRED BY CLAIM PRECLUSION

#### A.   Res Judicata – Relevant Law

The doctrine of res judicata or claim preclusion serves to preclude a party from relitigation of the same claim in a subsequent proceeding involving the same parties based on entry of a final judgment "on the merits" in a proceeding, **even if the prior judgment was a result of a default or consent**. See *Lawlor v. Nat'l Screen Service, Corp.*, 349 U.S. 322, 75 S.Ct.

7

865 (1955); *Chromalloy Am. Corp. v. Kenneth Gordon, Ltd.*, 736 F.2d 694, 222 USPQ 187 (Fed. Cir. 1984); *Flowers Indus., Inc. v. Interstate Brands Corp.*, 5 USPQ2d 1580, 1583 (TTAB 1987).

For the doctrine of res judicata to apply, there must be (1) the same identity of parties or their privies for the first and second claim; (2) the second claim must be based on the same transactional facts as the first; and (3) a final judgment on the merits of the prior claim. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979); *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000).

It is critical to note that, unlike collateral estoppel which requires a final judgment on each issue to which collateral estoppel will apply, res judicata does ***not*** require a final judgment on every claim subsequently made. Rather, there must have been "a" final judgment in the previous proceeding. The previous judgment will then preclude ALL claims that ***could have been raised, even if they were not,*** in the prior action See *Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, 23 U.S.P.Q.2d 1134, 1138 (TTAB 1992); *Young Engineers, Inc. v. U.S. International Trade Commission*, 721 F.2d 1305, 1314 (Fed. Cir. 1983) ("issue preclusion operates only as to issues actually litigated, whereas claim preclusion may operate between the parties simply by virtue of the final judgment"); *Pactiv Corp. v. Dow Chem. Co.*, 78 USPQ2d 1939, 1941; *Urock Network, LLC v. Sulpasso*, 115 USPQ2d 1409, 1412 (TTAB 2015) (claim preclusion extends to relitigation of "claims that were raised *or could have been raised* in an earlier action" (quoting *Allen v. McCurry*, 449 US 90, 94 (1980) (emphasis added)); *Bacardi & Co. Ltd. v. Ron Castillo, S.A.*, 178 USPQ 242, 244 (TTAB 1973); see also *Vitaline Corp. v. General Mills Inc.*, 891 F.2d 273, 13 USPQ2d 1172, 1173-74 (Fed. Cir. 1989). see also *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."); *Aspex Eyewear Inc. v. Marchon Eyewear Inc.*,

101 USPQ2d 2015, 2020 (Fed. Cir. 2012) ("claim splitting is forbidden by the principles of res

judicata."); *Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368, 1370 (Fed. Cir. 2006)

(for claim preclusion to apply, "the second claim must be based on the same transactional facts

as the first and should have been litigated in the prior case.").

The concept of a "claim", for purposes of determining what constitutes the same

transactional facts, is explained in § 24 of the *Restatement (Second) of Judgments* as follows:

> (1) When a valid and final judgment rendered in an action extinguishes the
> plaintiff's claim pursuant to the rules of merger or bar, <u>the claim
> extinguished includes all rights of the plaintiff to remedies against the
> defendant with respect to all or any part of the transaction, or series of
> connected    transactions,    out    of    which    the    action    arose</u>.

> (2) What factual grouping constitutes a "transaction", and what grouping
> constitutes a "series", are to be determined pragmatically, giving weight to
> such considerations as <u>whether the facts are related in time, space, origin,
> or motivation, whether they form a convenient trial unit</u>, and whether their
> treatment as a unit conforms to the parties' expectations or business
> understanding or usage.

(Emphasis added).

"Claim preclusion, where found, operates to bar subsequent assertion of the same

transactional facts in the form of a different cause of action or theory of relief. Generally, this

principle rests on the assumption that all forms of relief could have been requested in the first

action." *Young Eng'rs, Inc.* at 1314 (Fed. Cir. 1983).

**B.    Application of Law to Facts**

**1. The first element of claim preclusion is met because the named
parties in this Cancellation proceeding are the identical parties
named in Prior Action.**

As to the first element of claim preclusion, the parties to this proceeding and the parties

in the Prior Action are exactly the same. This Cancellation proceeding is between David S.

9

Beasley and William H. Howard DBA The Ebonys; the Prior Action was also between David S. Beasley and William H. Howard DBA The Ebonys. See Exhibit B; *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1363 (Fed. Cir. 2000) (when the parties to both claims are identical, the first element has been met).

> **2. The second element of claim preclusion is met because the Cancellation Petition and the Prior Action are based on the same set of transactional facts.**

As to the second element of claim preclusion, the Cancellation Petition is based on the same transactional facts as the Prior Action. In determining whether the same set of transactional facts are present, the Federal Circuit considers whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. Phillips/May Corp. v. U.S., 524 F.3d 1264, 1271 (Fed. Cir. 2008). A review of Petitioner's submissions in the Prior Action (Exhibits B, C, D and E) makes obvious that the claims here arise from the same transactional facts as the Prior Action.

The facts alleged by Petitioner in its Cancellation Petition and in the Prior Action are related in time, space, origin, motivation and they form a convenient trial unit. In fact, the alleged facts are *identical*. In his Amended Petition in the Prior Action, Petitioner alleged and provided evidence of the following: (1) that Petitioner formed The Ebonys (with submitted evidence that he was using "THE EBONYS" long before Registrant); (2) that THE EBONYS was in use by Petitioner at least as early as 1971; (3) that Registrant does not have a right to use THE EBONYS (by virtue of the fact that he was not an original band member); (4) that Petitioner obtained a New Jersey trademark registration for THE EBONYS (and by virtue of that also had senior rights to the trademark over Registrant); (5) that Petitioner continues to use THE

EBONYS for entertainment services, including live performances; (6) that Petitioner never gave Registrant a right to use THE EBONYS; and (7) that Petitioner continues to use THE EBONYS.

In addition, at the beginning of his Amended Petition (in the Prior Action), Petitioner alleged that Registrant committed fraud in procuring the trademark because Registrant knowingly made false, material representations of fact in connection with the trademark application. See Exhibit B.

Though presented in a more traditional format and with a bit more detail, the instant Cancellation Petition raises nothing new that was not already alleged in the Prior Action, and certainly nothing new that arises out of *different* transaction facts. Paragraph 1 of the Cancellation Petition was covered in Paragraphs 2 and 7 of the Amended Petition in the Prior Action; Paragraph 3 of the Cancellation Petition is a statement of law, not an allegation of fact – it is based on the same "transactional facts" already alleged in the Prior Action; Paragraph 4 of the Cancellation Petition was covered in Paragraphs 2 and 7 of the Amended Petition in the Prior Action; Paragraph 5 of the Cancellation Petition raises no facts that are not part of the "transactional facts" already alleged in the Prior Action; Paragraph 6 of the Cancellation Petition was covered in Paragraphs 2, 3, 4, 5 and 7 of the Amended Petition in the Prior Action; Paragraph 7 of the Cancellation Petition was covered in Paragraph 5 of the Amended Petition in the Prior Action; Paragraphs 8 and 9 of the Cancellation Petition raise no facts that are not part of the "transactional facts" already alleged in the Prior Action.

Paragraphs 10 through 18 of the Cancellation Petition are all statements made in support of Petitioner's "fraud" cause of action. This cause of action, however, was already alleged and litigated in the Prior Action. Specifically, the Amended Petition in the Prior Action stated as grounds for cancellation the following: "Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with the

11

trademark application." See Exhibit B. The allegations made in the Cancellation Petition are certainly more specific – but they form the same fraud claim already alleged and litigated in the Prior Action. (The Board dealt with almost the same situation in *Orouba Agrifoods Processing Company v. United Food Import* (Cancellation No. 92050739), where it granted defendant's Motion for Summary Judgment based on claim preclusion).

In sum, the Prior Action alleged that Registrant committed fraud, that Petitioner is the sole rightful owner of the trademark, and that Registrant does not have rights to the trademark. These are the same allegations that are being made in the instant proceeding, and the facts that form the basis for the instant Cancellation Proceeding arise from the same "transactional facts" alleged (and covered in the evidence provided) in the Prior Action. Moreover, we are dealing here with the *identical* trademark registration, the *identical* services, and the *identical* parties.

### 3. The third element of claim preclusion is met because a final judgment was rendered in the Prior Action against Petitioner.

Registrant obtained a final judgment against Petitioner in the Prior Action. Res judicata does ***not*** require a final judgment on every claim subsequently made. Rather, there must have been "a" final judgment in the previous proceeding. The previous judgment will then preclude ALL claims that ***could have been raised, even if they were not,*** in the prior action See *Perma Ceram Enters. Inc. v. Preco Indus. Ltd.*, 23 U.S.P.Q.2d 1134, 1138 (TTAB 1992); *Young Engineers, Inc. v. U.S. International Trade Commission*, 721 F.2d 1305, 1314 (Fed. Cir. 1983) ("issue preclusion operates only as to issues actually litigated, whereas claim preclusion may operate between the parties simply by virtue of the final judgment"); *Pactiv Corp. v. Dow Chem. Co.*, 78 USPQ2d 1939, 1941; *Urock Network, LLC v. Sulpasso*, 115 USPQ2d 1409, 1412 (TTAB 2015) (claim preclusion extends to relitigation of "claims that were raised *or could have been raised* in an earlier action" (quoting *Allen v. McCurry*, 449 US 90, 94 (1980) (emphasis added));

*Bacardi & Co. Ltd. v. Ron Castillo, S.A.*, 178 USPQ 242, 244 (TTAB 1973); see also *Vitaline Corp. v. General Mills Inc.*, 891 F.2d 273, 13 USPQ2d 1172, 1173-74 (Fed. Cir. 1989). see also *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."); *Aspex Eyewear Inc. v. Marchon Eyewear Inc.*, 101 USPQ2d 2015, 2020 (Fed. Cir. 2012) ("claim splitting is forbidden by the principles of res judicata."); *Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368, 1370 (Fed. Cir. 2006) (for claim preclusion to apply, "the second claim must be based on the same transactional facts as the first and should have been litigated in the prior case.").

### V.    CANCELLATION PETITION IS BARRED BY ISSUE PRECLUSION

#### A.    Collateral Estoppel – Relevant Law

An additional and independent basis to dismiss Petitioner's Cancellation Petition is issue preclusion (*at least* with respect to the fraud claim). Even where claim preclusion does not apply (here it does), "the particular facts of certain cases may allow for the use of issue preclusion to bar relitigation . . . ." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365 (Fed. Cir. 2000); see also *Stephen Slesinger,  Inc. v. Disney Enters.*, Inc., 2011 WL 2489755, at * 3-7 (TTAB June 8, 2011) (precluding relitigation of issues determined in Civil Action that were raised again during cancellation proceeding). The underlying rationale of issue preclusion is that "a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided again." *Slesinger, Inc.*, 2011 WL 2489755 at *4.

The doctrine of issue preclusion, which serves to bar the revisiting of issues that have been already fully litigated, has four elements: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the

13

resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Jet, Inc.*, 223 F.3d. at 1366.

**B.      Collateral Estoppel – Application to Facts**

**1. The first element of issue preclusion is met because at least some of the issues in the Prior Action and this Cancellation proceeding are the same.**

As to the first element of issue preclusion, the issues of fraud and ownership of the trademark are the same issues that were litigated in the Prior Action. Thus, the same issues are present in this Cancellation proceeding as were present in the Prior Action.

**2. The second element of issue preclusion is met, at least with respect to the fraud issue, because the issues were fully litigated in the Prior Action.**

As to the second element of issue preclusion, the specific issues Petitioner raises in its Cancellation Petition were fully litigated in the Prior Action. *At the very least,* the fraud issue was fully litigated in the Prior Action.

**3. The third element of issue preclusion is met because the issues decided in the Prior Action were necessary to the judgment there.**

As to the third element of issue preclusion, the issues decided in the Prior Action were necessary to the judgment there. For the court to dismiss Petitioner's Amended Petition, it was necessary for the Board to determine that Petitioner did not present sufficient evidence to satisfy the elements of the claim(s). At the very least, this element is satisfied with respect to the fraud claim.

**4. The fourth element of issue preclusion is met because Petitioner had a full and fair opportunity to litigate the issues in the Prior Action.**

As to the fourth and last element of issue preclusion, Petitioner had a full and fair opportunity to litigate the exact same issues that it raises in its Cancellation Petition. In light of

14

the foregoing, Petitioner should be collaterally estopped from relitigating the same issues during this Cancellation proceeding.

**VI.**   **CONCLUSION**

For the foregoing reasons, Petitioner's Cancellation Petition should be dismissed on the grounds of claim and issue preclusion. The exact same claims and issues asserted in the Cancellation Petition were raised, fully litigated and adjudged on the merits against Petitioner in Cancellation Proceeding No. 92057071. Even if the Board finds that issue preclusion does not apply to all of the *issues*, Registrant respectfully submits that claim preclusion will apply to all of the claims made in this Cancellation Proceeding because all of the claims in this proceeding were alleged in the Prior Action, and all of the claims made in this proceeding arise from the "transactional facts" raised in the Prior Action.

Dated this 7th Day of August, 2017.

Moshe D. Lapin
LAPIN LAW FIRM
300 E. Lombard St.
Suite 840
Baltimore, MD 21202
Moshe@LapinLegal.com

15

CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing Motion for Summary Judgment has been served on Petitioner by emailing said copy on August 7, 2017 to the following email address(es):

uccupk@aol.com, jeffrey@jacobsonfirm.com

Moshe D. Lapin
Lapin Law Firm
300 E. Lombard St.
Suite 840
Baltimore, MD 21202
Moshe@LapinLegal.com

16

<u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that the foregoing Motion for Summary Judgment is being submitted electronically through the Trademark Trial and Appeal Board's ESTTA System on this 7th day of August, 2017.


Moshe D. Lapin
Lapin Law Firm
300 E. Lombard St.
Suite 840
Baltimore, MD 21202

**EXHIBIT A**

**December 9, 2014 TTAB DECISION**

**David S. Beasley v. William H. Howard d/b/a The Ebonys**

**Cancellation No. 92057071**

> This Opinion is Not a
> Precedent Of The TTAB

Mailed: December 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

‾‾‾‾

Trademark Trial and Appeal Board

‾‾‾‾

*David S. Beasley*

*v.*

*William H. Howard d/b/a The Ebonys*

‾‾‾‾

Cancellation No. 92057071

‾‾‾‾

David S. Beasley, *pro se.*

William H. Howard, d/b/a The Ebonys, *pro se.*

‾‾‾‾

Before Zervas, Ritchie and Adlin, Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

This is a cancellation proceeding in which Mr. David S. Beasley (Petitioner) seeks to cancel Registration No. 4170469, owned by Mr. William H. Howard, d/b/a The Ebonys (Respondent), for The Ebonys,[1] in standard character format, on the Principal Register, for "entertainment services in the nature of live performances by singing vocalists; entertainment in the

---

[1] Registered on the Principal Register on July 10, 2012, alleging dates of first use on April 17, 1998, and first use in commerce in 2003.

Cancellation No. 92057071

nature of vocal musical group; live performances by a musical group," in International Class 41.

The sole pleaded ground for cancellation is fraud.[2] Specifically, Petitioner alleges that he is an original member of the group The Ebonys, which "continu[es] to receive quarterly royalty statements." (petition at para. 1, 2). He further alleges that Respondent is not an "original member" and did not perform "any original live recordings." *Id.,* at para 3. Petitioner alleges that he "continues to manage goods and services involving the name "The Ebonys" and that he "never relinquished in writing or verbally his rights of [sic] the 'The Ebonys' name to registrant, any other individual and/or group to provide profit to themselves for services or goods." *Id.* at paras. 5, 6. Finally, petitioner alleges that he "continues with on-going projects as an original member/owner of 'The Ebonys." *Id.,* at para. 7.

Respondent filed an answer denying the salient allegations of the petition and setting forth some purported "affirmative defenses," including that "Petitioner failed to disclose that The Ebonys was resurrected with new members in 1997 and the Registrant and the Petitioner were members of that resurrected group." (Answer, affirm. def, 4.c.).

---

[2] With his initial petition to cancel, Petitioner checked off several grounds for cancellation on the ESTTA cover sheet but did not include a petition elucidating the grounds. In his amended petition, filed July 8, 2013, the sole ground stated was fraud. Since no other grounds were pursued nor pleaded with particularity, we consider any such grounds to have been waived. Furthermore, based on the lack of proper briefing and evidence, we do not find that any other claims were tried by implied consent.

2

Cancellation No. 92057071

Petitioner filed a paper during his briefing period through ESTTA, the Board's electronic filing system, titled "Amended Petition to Cancel." The ESTTA cover sheet identified the paper filed as "Brief on the Merits for Plaintiff." Petitioner's paper was not accompanied by a motion for leave to amend. Because Petitioner filed the paper during its briefing period and because the ESTTA cover sheet identified the filing as a "Brief," we treat the filing as Petitioner's brief.

The Record

Pursuant to Trademark Rule 2.122(b); 37 C.F.R. § 2.122(b), the record in this case includes the pleadings and the file of the involved registration. The parties both made submissions during their trial periods,[3] and Petitioner during his rebuttal period. These consist of the following:

During Petitioner's Trial Period:

1.  A state service mark registration issued by the State of New Jersey for The Ebonys, listing Petitioner as owner, with the filing date listed as March 7, 2003;

2.  Management contract between Petitioner and Lynn Gross, d/b/a Octagon Development Group, dated November 14, 2004;

---

[3] Petitioner submitted his Initial Disclosures, and Respondent submitted his Pretrial Disclosures, which need not be filed. However, since they were submitted during the respective trial periods, we construe them as notices of reliance. We note also that Petitioner attached several items to his petition and his amended petition. However, unless otherwise properly introduced into the record during trial, exhibits to pleadings are not evidence for that party, with one exception not applicable here. *See* Trademark Rule 2.122(c); 37 C.F.R. § 2.122(c)

Cancellation No. 92057071

3. Management contract between Petitioner, as "Owner of The Ebonys," and Forrest Finney and Michael Mackintosh, dated October 1, 2007;

4. A letter from Jeff Gandel of Royalty Recovery to Clarence Vaughan, dated September 14, 2010;

5. A letter to Royalty Recovery, Inc., from Petitioner and others, dated September 14, 2010;

6. A letter from Philadelphia Records, dated August 19, 2013;

7. A Royalty Statement for the period ending June 30, 2013, for "The Ebonys" c/o David Beasley, from Philadelphia International Records; and

8. A flyer advertising a concert by Ebony's Revue; printed from http://mail.aol.com on October 5, 2013.

During Respondent's Trial Period:

1. A copy of Respondent's involved registration and information from the underlying application file;

2. A copy of an article from *The Philadelphia Inquirer*, undated;

3. A copy of an article from *The Times*, dated April 17, 1998;

4. An autographed photograph of The Ebonys;

5. A copy of a ticket printed from *Ticketmaster.com* for The Ebonys, dated October 10, 2000;

6. A flyer advertising The Ebonys performing on December 31, 2003;

7. A flyer advertising Ebony's  [undated];

Cancellation No. 92057071

8. A printout advertising "The Big Show" DVD featuring The Ebonys; printed from oldies.com, undated;

9. A ticket and flyer advertising The Ebonys, featuring William "SMOKE" Howard at The Firehouse Café, September 10, 2011;

10. A flyer advertising The Ebonys dated October 27, 2012;

11. A flyer advertising The Ebonys, dated September 14, 2013; and

12. A copy of an article from *What's Inside*; Spring/Summer 2012, Vol. 1, Issue 9.

During Petitioner's Rebuttal Period:

1. Letter from Kenneth Gamble of Philadelphia International Records to Petitioner, dated May 12, 2014; and

2. Letter from Philadelphia International Records dated March 3, 2014, and attached W-9, signed by Petitioner.

Much of this material submitted by both parties is not suitable for the notice of reliance procedure. *See* Rule 2.122(e); 37 C.F.R. § 2.122(e) (permitting notice of reliance on official records, or printed publications "available to the general public in libraries or of general circulation"); and *Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1039 (TTAB 2010) (permitting notice of reliance on Internet printouts that identify the date of publication or date accessed as well as the website address). We note, however, that neither party objected to the other's submissions, and their consideration does not affect the outcome of our decision. Accordingly, we

5

Cancellation No. 92057071

may include them in our analysis. *See Morgan Creek Productions Inc. v. Foria Int'l Inc., 91 USPQ2d 1134, 1136* (TTAB 2009) (although materials were not properly made of record, parties treated them as such, and thus Board deemed the parties to have stipulated the materials into the record); *Alfacell Corp. v. Anticancer Inc.*,71 USPQ2d 1301 (TTAB 2004) (evidence not properly made of record deemed stipulated into the record because it was treated as such by the parties).

Standing

To establish standing, a petitioner must establish a "personal interest in the outcome of the proceeding" as well as "a reasonable basis for belief of damage." *See Books on Tape Inc. v. The Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (petitioner, as a competitor of respondent, "clearly has an interest in the outcome beyond that of the public in general and has standing"). "A belief in likely damage can be shown by establishing a direct commercial interest." *See Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

We must assess whether a plaintiff is a mere intermeddler or has real interest in the case. *See Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Indus. Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). Under this liberal standard, Petitioner has shown that he has a reasonable belief of damage and a real interest in this proceeding, because Respondent admits that Petitioner was a member of The

Cancellation No. 92057071

Ebonys, and the record includes Petitioner's New Jersey service mark registration. Therefore Petitioner is not a mere intermeddler, and he has established his standing. *Id.;* 15 U.S.C. § 1064.

Fraud

The only ground alleged in the amended petition for cancellation is fraud. Petitioner alleges that the group The Ebonys was formed in 1969 and consisted of several vocalists, which included Petitioner, but did not include Respondent. (petition at para. 1). The amended petition further alleges that The Ebonys was signed to a record deal and "continu[es] to receive quarterly royalty payments." *Id.* at para. 2; and that Respondent "was not and is not an original member or performed on any original live recordings of The Ebonys singing/performing group." *Id.,* at para. 3. The amended petition further alleges that Petitioner registered The Ebonys with the State of New Jersey in 1997. *Id.,* at 4.

The Court in *In re Bose Corp.*, 476 F.3d 1331, 91 USPQ2d 1938, 1939 (Fed. Cir. 2009), set out the relevant standard for proving fraud:

> "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *Torres v. Cantine Torresella S.r.l.,* 808 F.2d 46, 48 [1 USPQ2d 1483] (Fed. Cir. 1986). A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.,* 377 F.2d 1001, 1004 [153 USPQ 749] (CCPA 1967). Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing

Cancellation No. 92057071

> evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Smith Int'l, Inc. v. Olin Corp.,* 209 USPQ 1033, 1044 (TTAB 1981).

Petitioner has failed to submit evidence showing that Respondent made a false, material representation of fact in connection with his trademark application, and that he did so with the intent to deceive the Trademark Office. The claim thus fails.

*Decision*: The petition to cancel is dismissed.

**EXHIBIT B**

**Cancellation No. 92057071**

**Amended Petition For Cancellation filed by David S. Beasley**

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA547176** |
|---|---|
| Filing date: | **07/08/2013** |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92057071 |
|---|---|
| Party | Plaintiff<br>David S. Beasley |
| Correspondence<br>Address | DAVID S BEASLEY<br>1801 LAUREL ROAD, UNIT 612<br>LINDENWOLD, NJ 08021<br>UNITED STATES<br>dbea856005@aol.com |
| Submission | Motion to Amend Pleading/Amended Pleading |
| Filer's Name | Mr. David S. Beasley |
| Filer's e-mail | dbea856005@aol.com |
| Signature | /David S Beasley/ |
| Date | 07/08/2013 |
| Attachments | petition for cancellation-final.pdf(514364 bytes )<br>Ebony Document 1.pdf(1545326 bytes )<br>Ebony Document 2.pdf(2330300 bytes )<br>CERTIFICATE OF SERVICE.pdf(95841 bytes ) |

"IN THE UNITED STATES PATENT AND TRADEARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD,"

In the Matter of trademark Registration No. 4,170,469

For the Mark: The Ebonys

Petitioner
David S. Beasley
1801  Laurel Road Unit 612
Lindenwold, NJ   08021

            v.

Registrant
William H. Howard dba The Ebonys
104 S. Glenwood Avenue
Aldan, PA  19018-4016

Cancellation No. 92057071

**AMENDED PETITION TO CANCEL A TRADEMARK REGRISTRATION.**

David Beasley the petitioner believes that he will be damaged by the above-identified registration,

and hereby petitions to cancel the same.

The Grounds for Cancellation are as follows:

Fraud

- *Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with the trademark application.*

1. The Ebonys were formed in 1969 by David Beasley/petitioner and consist of three vocalists

including himself; James Tuten (deceased) Clarence Vaughn and Jennifer Holmes.

2.  The Ebonys were officially signed with Assorted Music Records dba Philadelphia International

Records in January 1971 and continue to receive quarterly royalty statements.

3.  Registrant was not and is not an original member or performed on any original live recordings of

 The Ebonys singing/performing group.

4.  David Beasley/petitioner registered "The Ebonys" with the State of New Jersey as Class 041 in

1997.

5.  David Beasley/petitioner continues to manage goods and services involving the name "The Ebonys".  David Beasley/petitioner manages entertainment services  in the nature of live performances by vocalist; entertainment in the nature of vocal music groups; and live performances by musical groups.

6.  David Beasley/petitioner never relinquished in writing or verbally his rights of the "The Ebonys" name to registrant, any other individual and/or  group to provide profit to themselves for services or goods.

7.  David Beasley/petitioner continues with on-going projects as an original member/owner of the "The Ebonys".


By: David S. Beasley                                    Date:  July  8, 2013
     Petitioner



June 7, 1996


Artist Right Enforcement Crop
250 W. 57th Street
Suite 520
New York,  New York


Mr. Chuck Rubin,

    I am a member of the former singing group The Ebonys.  Attached is a  copy of my contract that was signed in January 1971.   I have been referred to you by Bernie Wilson (The BlueNotes), to address the issue of royalties.

    Attached find a list of songs that were released but not apart of the album, along with songs that were on the album.

    I have been intouch with Clarence Vaughn & Jennifer Holmes Rossi in reference to contacting you (members).  They are interested in hearing from you.  If I can be of further assistance, please contact me.

    Thank you in advance for your time.  Looking forward to hearing from you in the near future.


David Beasley

attachments

ALBUM TITLE:     THE EBONYS

SIDE I                                          SIDE II

HOOK UP AND GET DOWN                            I'M SO GLAD I'M ME
IT'S FOREVER                                    I'LL TRY
LIFE IN THE CONTRY                              NATION TIME
SEXY WAYS                                       I BELIEVE
                                                YOU'RE THE REASON WHY

45 RELEASES

2 WRONGS DON'T MAKE A RIGHT
DETERMINATION
SORRY WE COULDN'T MAKE IT
CHRISTMAS JUST AIN'T CHRISTMAS (Without the One you Love)

Compact Disc has been released in the States, also Japan - 1995
See attached

Platinum Classic Recording has a Groove Me album with Ebony Recording on it.

## Ebony Members

Mr. Clarence Vaughn
728 Bentley Road
Lindenwold, NJ  08021
609-783-7135

Mrs. Jennifer Holmes Rossi
3753 King Avenue
Pennsauken, NJ  08105
609-663-8419

Mr. David Beasley
612 Timber Creek Condos
Lindenwold, NJ  08021
609-784-3037

Mr. James Tooten (deceased 1995)

# THE EBONYS
エボニーズ

| | | |
|---|---|---|
| **HOOK UP AND GET DOWN** | K. Gamble/L. Huff | 3:26 |
| **IT'S FOREVER** | ケープ・ダウン | 7:19 |
| **LIFE IN THE COUNTRY** | L. Huff | 6:17 |
| **I'M SO GLAD I'M ME** | Leon Huff/L.Graham | 3:08 |
| **SEXY WAYS** | K. Gamble/L. Huff | 3:03 |
| **I'LL TRY** | L. Huff/J.Questionote | 6:13 |
| **NATION TIME** | K. Gamble/L.Huff | 4:59 |
| **I BELIEVE** | K. Gamble/L. Huff | 4:32 |
| **YOU'RE THE REASON WHY** | K. Gamble/L. Huff | 3:08 |

P-3510 Determination
P-3503 Youre The Reason Why
Sexy Ways
P-3514 Without The One You Love
Without The One You Love (inst.)
P-3514 I'm So Glad I'm Me
Do You Like The Way I Love
P-3629 It's Forever
P-3541 I Believe
Nation Time
P-3548 Life In The Country
Hook Up And Get Down







© All rights reserved 1995

Distributed by Collectables Records, Box 35, Narberth, PA 19072.   SEND FOR FREE CATALOG

## THE EBONYS - Golden Classics:  Collectables 5659

The Ebonys have the distinction of scoring the first hit on Philadelphia International Records.  The Camden, New Jersey, quartet was formed in the late '60s in their hometown, just across the Delaware River from Philadelphia.  Initially restricted to playing local clubs, they got their big break when Leon Huff heard them perform.

Huff and his partner, Kenny Gamble, had already produced hits for artists like The Intruders and Jerry Butler.  They had even tried to start a couple of their own labels, but were discouraged by the lack of promotion, especially after a bitter experience with Chess Records, which had handled their Neptune label.

Despite their problems with bigger companies, Gamble and Huff were still convinced their unique blend of funky rhythm and blues with sophisticated, highly orchestrated musical backgrounds could find a large audience.  They finally signed with one of the biggest labels in the world, cutting a deal with Columbia Records in 1971 to distribute and market their Philadelphia International label.

The first few P.I. singles didn't set the charts on fire.  But they did a lot better with Philadelphia International 3503.  "You're The Reason Why" was written by Gamble and Huff and arranged by the accomplished Thom Bell.  The dramatic ballad was a perfect vehicle for The Ebonys.  It featured the haunting voice of Jennifer Holmes at the beginning of the song before she gave way to the rest of the group and their tormented emotionalism.  Holmes, along with David Beasley, James Tuten and Clarence Vaughn, saw their powerful debut soar into the Billboard rhythm and blues Top 10 in the early summer of 1971.  It also just missed the pop Top 50.

Gamble and Huff continued to work with their newest hitmakers, but subsequent singles didn't fare as well as their debut.  The strong "Determination" (P.I. 3510) made it into the R&B Top 50 in late 1971.  They did better with "It's Forever" (P.I. 3529), a classic soul ballad written by Leon Huff, that went to No. 14 on the R&B chart in the spring of 1973.

The group scored one more Philadelphia International hit.  "Life In The Country" (P.I. 3548) went to No. 69 on the R&B charts in the fall of '74.  Their one Philadelphia International album - "The Ebonys" - is the source for much of the material on this collection of their best work.

After leaving the Gamble-Huff operation, The Ebonys did score one more minor hit.  They went to No. 83 in the fall of 1976 with "Making Love Ain't No Fun (Without The One You Love)" on Buddah 537.

After the hits slowed down The Ebonys drifted apart.  But Jennifer Holmes did have another run of success as a member of the Philly-based quartet Creme D'Cocoa, which scored four hits in the late '70s for the Venture label.  Their biggest success was "Doin' The Dog" (Venture 112), which went to No. 30 on the Billboard R&B chart.

While The Ebonys will always have the distinction of being the first hit act on Philadelphia International, it's clear from the material on this album that their success was no fluke.  Jennifer Holmes and her three partners were fine singers and they did a very good job with the songs Gamble and Huff gave them.  This is a tribute to the unique talent of both the singers and their producers.

--MARK MARYMONT

*Billboard chart numbers courtesy of Joel Whitburn's Record Research.*



**SUPER HITS**

**INTRUDERS SUPER HITS**

**NICE PRICE LINE 30**

**PHILADELPHIA INTERNATIONAL RECORDS SERIES**

¥ 1,800 （税込） 好評発売中

**THE EBONYS**

**HAROLD MELVIN & THE BLUE NOTES**

**360 DEGREES OF BILLY PAUL**

**BILLY PAUL**

**IN PHILADELPHIA**

**THE O'JAYS**

## 8. I BELIEVE

## 9. YOU'RE THE REASON WHY



THE EBONYS



DAVID BEASLEY

CLARENCE VAUGHN

WILLIAM TULEY

JENNIFER HOLMES RIDZ1



1973

**THE EBONYS**





**NEW JERSEY DEPARTMENT OF STATE**
**DIVISION OF COMMERCIAL RECORDING**
**ORIGINAL APPLICATION TO REGISTER**
**A TRADE OR SERVICE MARK**

TMSM-01

*This form may be used by applicants seeking to register a State trade or service mark pursuant to NJSA 36. Applicants are responsible for strict adherence to all requirements set forth in State law.* **(PLEASE REFER TO INSTRUCTIONS ON REVERSE SIDE)**

1. **Mark Type: (check one)** _____ **Trade Mark** ___XXXX___ **Service Mark**

2. **Name and Description of Mark:** (list the term that constitutes the mark or, in the case of a design mark, provide a brief description of its appearance)

   THE EBONY'S

3. **Description Of The Goods Or Services Involved:**

   ENTERTAINMENT/SINGING

4. **Classification Number(s):** (Minimum of one)

5. **Applicant Information:**

   a. Name:   DAVID S.   BEASLEY
   b. Business Address:   612 TIMBERCREEK CONDOS
      LINDENWOLD, NJ   08021
   c. Applicant is: (check one)   _xx_ An Individual ____ Corporation ____ Partnership ____ Other Business Entity
   d. If applicant is a corporation, partnership or other business entity, list the home state:
      N/A
   e. If applicant is a partnership, list the names of all general partners:
      N/A

6. **Assignee Information:** (if applicable, provide assignee name/address)

   a. Name:   N/A
   b. Address:

7. **Dates:** Date First Used in New Jersey (must be entered) __1969__ Date First Used Elsewhere: __1969__

8. **Signature(s) and Statement of Ownership:** (verification required)

The applicant attests that he or she is the owner of the mark, and that the mark is in use in this State, and that, to his or her knowledge, no other person has registered the mark, either with the US Patent and Trade Mark office or with the Secretary of State, or has the right to use the mark or a mark in such near resemblance as to be likely, when used in connection with the goods or services of such other person, to cause confusion, to to cause mistake, or to deceive.

_____   ___5/16/97___
(Signature of Applicant, or a Member of the Firm,    (Date)
or an Officer of the Corporation or Business Applying)

_____   _____
(Assignee, if Applicable)   (Date)

Subscribed and sworn to before me, _____, a Notary Public,
this __16th__ day of __May__ A.D. 19_97_ .

_____
(Notary Public)

"ROSE D. GIUFFRE
Notary Public of New Jersey
My Commission Expires 11/28/98"

*Note: Attach to this application: 1) a drawing of the mark; and 2) three (3) specimens showing the mark as actually used.*

I, THE TREASURER THE STATE OF NEW JERSEY,  DO HEREBY
CERTIFY THAT

          DAVID S. BEASLEY
          612 TIMBER CREEK CONDOS
          LINDENWOLD  NJ  08021

DID ON THE 7TH DAY OF MARCH      A.D. 2003 FILE IN THIS
DEPARTMENT
          SERVICE MARK
          MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :    041   EDUCATION AND ENTERTAINMENT

RENEWAL DATE:                03/19/2013
EXPIRATION DATE:             03/07/2018
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:       01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.



IN TESTIMONY WHEREOF, I HAVE
HEREUNTO SET MY HAND AND AFFIXED
MY OFFICIAL SEAL AT TRENTON, THIS
  19TH DAY OF    MARCH
A.D.   2013 .

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certificate Number:  127767183

Verify this certificate online at

http://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp





**Philadelphia International Records**

May 20, 2010


The Ebonys
c/o David Beasley
1801 Laurel Road
Lindenwold, NJ 08021


**Re: Royalty Statement for PE 12/31/09**


Mr. Beasley,

Enclosed please find the most current Ebonys Royalty Statement for *Period Ending December 31, 2009* for The Ebonys. Thank you for providing us the necessary contact information needed for future Ebonys royalty statements. Pursuant to our email and phone correspondence, it is our understanding that you are an official and legal representative of the group and are authorized to receive information on the group's behalf.

For any further questions, please give us a call at (215) 985-0900.



Sincerely,

Charles B. Gamble
Executive Vice President
Philadelphia International Records


Cc: Royalty Administration


**THE AVENUE OF THE ARTS**
215.985.0900 • Fax 215.985.1195
309 South Broad Street • Philadelphia PA 19107
www.gamble-huffmusic.com

ASSORTED MUSIC, INC.
250 South Broad Street
Philadelphia, Pennsylvania  19102



January 1, 1971

Messrs. David Beasley, Clarence
E. Vaughn, James Tuten and
Miss Jennifer Holmes
p/k/a "Ebonys"
c/o Gerald Wilson
403 Parry Road
Cinnaminson, New Jersey

Dear Sirs and Miss Holmes:

The following, when signed by you and us, will consti-
tute the agreement between you and us, pursuant to which you will
perform exclusively for us as a recording artist, upon the terms
and conditions herein set forth:

1.  This agreement shall commence as of the date Janu-
ary 1, 1971,     and shall continue in force for a term which shall
consist of an initial period of  one (1) year   from such date, and
the additional period or periods, if any, by which such term may
be extended through our exercise of one or more of the options
granted to us herein.

2.  During the term of this agreement, you will render
your services at recording sessions at studios selected by us, at
times and places to be designated by us, for the purpose of making
phonograph records.  The musical compositions to be recorded shall
be designated by us, and each master recording made hereunder shall
be subject to our approval as satisfactory for the manufacture
and sale of records.  During the initial period of the term hereof,
you will perform for the recording of satisfactory master record-
ings which shall consist of a minimum of   four (4)        45 r.p.m.
sides, or their equivalent, and we will record your performances.
Additional master recordings shall be performed by you and recorded
by us at our election.

-2-

3.   During the term of this agreement you will not perform for the purpose of making phonograph records or master recordings for any person other than us, and during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not perform any musical composition which shall have been recorded hereunder for any person other than us for the purpose of making phonograph records or master recordings.  It is agreed between you and us that your services to be rendered hereunder are of a special, unique, unusual, extraordinary and intellectual character, involving skill of the highest order, which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law, and that your breach of any of the provisions contained in this agreement shall cause us irreparable damage and injury.  You hereby expressly agree that we will be entitled to injunctive relief and other equitable relief to prevent or cure any breach or threatened breach of this agreement by you.

4.   All master recordings recorded hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our property, free from any claims whatsoever by you or any person deriving any rights or interests from you.  Without limiting the generality of the foregoing, we and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture by any method now or hereafter known phonograph records and other reproductions on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade name and label, or to refrain from such manufacture, sale and dealing.

5.   At our election, all compositions recorded pursuant to this or any other agreement between you and us which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have a direct or indirect interest, shall be licensed to us at a royalty rate of 1-1/2        cents per 45 r.p.m. record side, or its equivalent, on the basis of Ninety (90%) Per Cent of net sales of records, except that (i) with respect to records sold

-3-

and/or distributed as "bonus" or "free" records through "Club
Operation" (as defined in sub-paragraph 8 (b) of this agreement),
the royalty rate shall be three-fourths (3/4ths) of the rate set
forth above, payable on the basis of Ninety (90%) Per Cent of net
sales of records; and (ii) no copyright royalties shall be pay-
able with respect to records described in sub-paragraph 8 (f)
hereof. Arranged versions of musical compositions in the public
doman, when furnished by you or any party described above for
recordings hereunder, shall be free of copyright royalties. Any
assignment made of the ownership or copyright in any such compo-
sition or in any such arranged version of a musical composition
in the public domain shall be made subject to the provisions
hereof. In the event we are required to pay mechanical copyright
royalties in excess of those provided in this Paragraph 5, we
shall have the right to charge such excess against all royalties
or other sums payable to you hereunder.

6. (a) For your services rendered hereunder, and for
the rights granted herein to us, we will make a non-returnable
payment to you, within fourteen (14) days after the services are
rendered at each recording session, at the rate of union scale;
and each such payment shall constitute an advance and shall be
charged against your royalties under this and/or any other
agreement between you and us, if and when earned. Without
limiting the generality of the foregoing, included amont pay-
ments which shall hereunder constitute advances chargeable
against royalties shall be all amounts which are paid by us pur-
suant to the requirements of any collective bargaining agreement
between us and any union representing you for performances here-
under.

(b) We shall specify your accompaniment (instru-
mental and vocal), arrangements and copying and studio charges
and/or rentals in respect of master recordings made hereunder,
and we shall pay the costs of such accompaniment as well as the
costs of such arrangements and copying and studio charges and/or
rentals which are specifically undertaken in respect of such
master recordings (such costs are hereinafter collectively re-
ferred to as "Accompaniment Costs"); and all such Accompaniment
Costs so paid by us shall constitute advances and shall be
charged against your royalties earned. Without limiting the
generality of the foregoing, including among Accompaniment Costs,

which shall hereunder constitute advances chargeable against royalties, shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreements between us and any union representing other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals for performances hereunder.

7.  (a)  We will pay you a basic royalty of (i) Six (6%) Per Cent of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely on both sides thereof a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee to whom we have supplied a copy or duplicate of a master or a matrix of or embodying such composition or compositions; and (ii)  one-half (½) of such percentage of the applicable wholesale price (less all taxes) in respect of Ninety (90%) Per Cent of all phonograph records consisting entirely of such composition or compositions on only one side thereof, so manufactured and sold.  In computing the number of records manufactured and sold hereunder, we shall have the right to deduct returns and credits of any nature, including, without limitation, those on account of.One Hundred (100%) Per Cent return privileges, defective merchandise, exchange privilege, promotional credits, error in billing, usable overstock and error in shipment.

(b)  Royalties for records sold for distribution outside of the United States of America shall be computed in the national currency, at our election, of the country of manufacture, the country of sale of the United States of America, and as to sales made for distribution outside of the United States of America, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold for distribution outside of the United States of America shall not be due and payable until payment therefor has been received by us in the United States of America, and provided further, that if we do not receive payment in United States dollars currently and elect to accept payment in a foreign currency, we may deposit to your account (and at your expense) in such currency in a depository selected by us, all payments so received as royalties applicable to this agreement, and shall notify you thereof promptly.  Such deposit, as above stated, shall fulfill our obligation hereunder

as to record sales to which such royalty payments are applicable.

(c) With respect to any master recording embodying your performance hereunder, together with the performance of another artist or artists to whom we are obligated to pay royalties in respect of phonograph records embodying the joint performances contained on such master recording:

(i) the royalty rate to be used in determining the royalties payable to you in respect of such master recording shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on such master recording; and

(ii) in determining the portion of the Accompaniment Costs applicable to such master recording which shall be charged against your royalties if and when earned, such portion shall be computed by multiplying the aggregate amount of such Accompaniment Costs by the same fraction used in determining the royalties payable to you in respect of such master recording.

(d) With respect to a side of a long-playing (33-1/3 r.p.m.) or extended-play microgroove record, which embodies on such side performances contained on another master recording(s) in addition to the performances contained on a master recording(s) recorded hereunder, the royalty payable to you in respect of such record side shall be computed by basing the rate provided in sub-paragraph 7(a) (ii) (or other applicable rate) upon that proportion of the applicable wholesale price (less all taxes) of such record that the number of 45 r.p.m. sides required to embody your performances recorded hereunder on such record side bears to the total number of 45 r.p.m. sides required to embody the total number of performances on such record side.

(e) With respect to all phonograph records sold hereunder, royalties on phonograph records included in albums, jackets, cartridges, cassettes, boxes or any other type of package or container (herein collectively referred to as "container(s)") shall be

based solely upon the applicable wholesale price of such phonograph records in containers less all taxes and also less a container charge not to exceed Ten (10%) Per Cent of the applicable price of disc phonograph records and Twenty-five (25%) Per Cent with respect to all other forms of records as defined in sub-paragraph (e) (i) or (e) (ii), as the case may be, of Paragraph 16 hereof.

8.   Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any other such agreement and sold and/or distributed in the manner set forth hereinbelow:

(a)   In respect of phonograph records sold for distribution outside of the United States of America, the royalty rate payable to you therefor shall be equal to one-half (½) of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States of America.

(b)   In respect of phonograph records sold through any direct mail order operation or through any direct sales-to-consumer operation carried on by us, our subsidiaries, affiliates or licensees including, without limitation, any Record or Tape Club (herein collectively referred to as "Club Operation"), the royalty rate shall be one-half (½) of the otherwise applicable royalty rate.  Notwithstanding the preceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of One ($1.00) Dollar or less, the royalty rate payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than One ($1.00) Dollar and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges). Notwithstanding anything contained in the foregoing two sentences or elsewhere in this agreement, no royalty shall be payable to you with respect to (i)  phonograph records which are received

by members of any such Club Operation, either in an introductory offer in connection with such Club Operation or upon recommending that another join such Club Operation and/or as a result of the purchase of a required number of records, including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

(c) In respect of phonograph records sold to our clients for promotional, sales incentives or educational purposes or phonograph records sold to educational institutions or libraries, the royalty rate payable to you therefor shall be one-half (1/2) the royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

(d) In respect of phonograph records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be one-half (1/2) of the applicable royalty rate otherwise payable if such record(s) were sold in disc form.

(e) In respect of phonograph records sold on a "low-price" or "budget" label, the royalty rate shall be one-half (1/2) the applicable rate otherwise payable.

(f) No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no-charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

9. In respect of the royalties provided for herein:

(a) We will compute royalties payable to you hereunder within sixty (60) days after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6)-month period, and will render accountings for and pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such sixty (60) days, except as provided in sub-paragraph 7(b) hereof, and except with respect to sales of records upon which royalties are payable to us by a distributor thereof. We shall be responsible for payment of your royalties on such sales only after receipt by us from such distributor of the royalties applicable to such sales.

-8-

   (b) All royalty statements and all other accounts rendered by us to you hereunder shall be binding upon you and not subject to any objection by you for any reason whatsoever, unless specific objection in writing, stating the basis thereof, is given to us within six (6) months from the date rendered. Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of Fifty ($50.00) Dollars or less, unless we receive a written demand from you for such an accounting and payment.

   10. (a) We shall have the right to use and to allow others to use your name and likeness and biographical material concerning you for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products. We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent. During the term of this agreement, you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

   (b) Without limiting the provisions of sub-paragraph 10(a) hereof, you hereby grant to us, during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively referred to as "sale(s)") of merchandising rights and to enter into agreements covering such sales. It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof, but after the termination of the term of this agreement, we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement. For the rights granted by this sub-paragraph we will pay you, in United States dollars, Fifty (50%) Per Cent of the net monies earned and received by us in the United States of America from such sales of merchandising rights authorizing the use of your name and/or likeness and/or biographical material concerning you pursuant to this agreement.

-9-

(c)  You warrant and represent that you own all
rights in and to the name   "Ebonys"
(hereinafter referred to as the "Name"), and that you have the
sole and exclusive right to use and to allow others to use the
Name in connection with the manufacture, advertising and sale of
phonograph records.  You hereby grant to us, and further warrant
and represent, that we shall have the right to use and to allow
others to use the Name for advertising and purposes of trade and
otherwise without restriction in connection with the phonograph
records made pursuant to this agreement and in advertisements for
our company,  its artist and products and exclusively in connec-
tion with the merchandising rights to the same extent and on the
same terms and conditions as set forth herein with respect to your
names.  It is understood and agreed that (i)  during the term of
this agreement you will not authorize or knowingly permit any per-
formance by any person or persons who shall in any way be identi-
fied with the Name (or any name substantially similar thereto) for
the purpose of making phonograph records for any person other than
us, and (ii)  during a period of five (5) years after the expira-
tion of the term of this agreement, for any reason whatsoever,
you will not authorize or knowingly permit the performance by any
person or persons who shall in any way be identified with the Name
(or any name substantially similar thereto) of any compositions re-
corded hereunder for any person other than us for the purpose of
making phonograph records.  It is further understood and agreed
that you will not at any time manufacture, distribute or sell or
authorize or knowingly permit the manufacture, distribution or
sale by any person other than us of phonograph records embodying
(i)  the performances by any person or persons rendered during the
term of this agreement, or (ii)  the performance by any person or
persons of a composition recorded hereunder rendered within five
(5) years after the expiration of the term of this agreement, which
phonograph records and/or performances shall in any way be identi-
fied with the Name or any name substantially similar thereto.  You
acknowledge that any use of the Name (or any name substantially
similar thereto) contrary to the provisions hereof would cause us
irreparable injury, and you agree to use your best efforts in as-
sisting us to prevent any such use.

(d)  In the event that during the term of this agree-
ment any artist shall leave the group hereunder identified with the
Name and/or shall cease to perform as a member of such group, you
shall promptly give us notice in writing to such effect and in the
event we shall deem it advisable, such leaving member shall be re-
placed by a new member who shall be mutually acceptable; and the

-10-

name of such new member shall thereafter be deemed substituted in
this agreement in the place of such leaving member, and such new
member, by performing hereunder, shall automatically be bound by
all the terms and conditions of this agreement. Upon our request
therefor, the remaining members of the group will duly cause any
such new member to execute and deliver to us such document as we,
in our judgment, may deem necessary or expedient to carry out or
effectuate the purpose or intent of the foregoing sentence. Such
leaving member shall thereafter be relieved from further perform-
ances hereunder with the group, but shall continue to be bound
individually by the applicable provisions of this agreement in-
cluding, without limitation, the provisions set forth in sub-
paragraphs 10(e) and 3 hereof.

(e)  You warrant and represent that, in the event
any one or more of the artists shall so leave the group as pro-
vided in sub-paragraph 10(d) hereof, we shall have, and you and
each of you does hereby grant to us, and irrevocable option on
your individual and exclusive services for the purpose of making
phonograph records.  Such option, with respect to any such leav-
ing member, may be exercised by us by giving such leaving member
notice in writing within ninety (90) days after our receipt of
the notice provided for in said sub-paragraph 10(d); and, in the
event of our such exercise of option, such leaving member shall
execute our then current standard form of term recording contract
containing the following provisions:

(i)  a term consisting of not less than the
remaining balance of the term of this agreement as it may be ex-
tended by our exercise of the options granted to us herein;

(ii)  a minimum of  four (4)    45 r.p.m.
record sides or their equivalent for which satisfactory master re-
cordings will be performed and recorded during each year of such
term, it being understood and agreed that if the remaining balance
of the term of this agreement shall be less than six (6) months,
then the minimum number of such 45 r.p.m. record sides for which
master recordings will be performed and recorded during such re-
maining balance of the term shall be one-half (½) of the foregoing
number;

(iii)  a royalty in respect of phonograph re-
cords embodying performances recorded during such term at the rates
set forth in Paragraphs 7 and 8 of this agreement; and

-11-

(iv) a payment for services rendered at each recording session at the rate of union scale, which payment shall constitute advances chargeable against such royalties.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this sub-paragraph 10(e) shall be applicable with respect to each member of the group.

(f) As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent. Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several and all references herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.

11. You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(a) any performance rendered by you during the term of this agreement; or

(b) any performance rendered by you within five (5) years after the expiration of the term of this agreement of a composition which shall have been recorded pursuant to this agreement.

You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances. Specifically, without limiting the generality of the foregoing, you agree:

(a) if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or scundtracks for motion picture films; or

(b) if, within five (5) years after the expiration of the term of this agreement you perform for any such purpose any composition which shall have been recorded pursuant to this agree-

-12-

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records.

You will promptly furnish to us, at our Philadelphia office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

12.   You warrant and represent that you are under no disability, restriction or prohibition in respect of (a)  your right to execute this agreement and perform its terms and conditions, and more particularly, (b)  your right to perform for the recording of any and all compositions hereunder, except to the extent, if any, set forth in Schedule I attached hereto and made a part hereof.  You agree to and do hereby indemnify, save and hold us harmless from loss or damage (including reasonable attorneys fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this agreement.  You will reimburse us on demand for any payment made by us at any time after the date hereof in respect of any liability or claim to which the foregoing indemnity relates.

13.   We may, at our election, assign this agreement or any of our rights hereunder.

14.   (a)  You warrant and represent that you are now a member in good standing of the American Federation of Television and Radio Artists, or will become a member within thirty (30) days after your first engagement with us, and that you will remain so during the term of this agreement.

(b)  The provisions of the AFTRA National Code of Fair Practice for Phonograph Recordings are made a part of this agreement with the same force and effect as if fully set forth herein.

(c)  If, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of Paragraph 2 hereof or, if due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within our control, or which we could not, by reasonable

-13-

diligence, have avoided, we are materially hampered in the record-ing, manufacture, distribution or sale of records, or our normal business operations become commercially impractical, then, without limiting our rights in any such event, we shall have the option, without liability, to suspend operation of Paragraph 2 and/or sub-paragraph 9 (a) of this agreement for the duration of any such con-tingency by giving you written notice thereof; and at our election, a period of time equal to the duration of such suspension shall be added at the end of the then current period of the term hereof, and then such period and the term of this agreement shall be accordingly extended.

15.  If, during the term of this agreement we fail, ex-cept for reasons set forth in Paragraph 14 hereof, to record master recordings constituting the minimum number of record sides provided for herein and, if within thirty (30) days after the expiration of the term hereof you shall notify us by registered mail of your re-quest that we record such of your performances as well as fulfill our minimum obligation hereunder, then we shall, at our option, with-in sixty (60) days after our receipt of such request, either record such performances or pay you at the rate of union scale in full set-tlement of our obligation in connection therewith.  In the event that you do not so notify us within such thirty (30)-day period, then we shall be under no obligation to you for failure to record master recordings constituting such minimum number of record sides.

16.  For purposes of this agreement:

(a)  "Master recording" means any original recording, whether on magnetic tape or wire, a laqueur or wax disc, or on any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records;

(b)  "Matrix" means any dye or mold or device which is now or hereafter used, directly or indirectly, in the manufac-ture of phonograph records and which is made from master recordings;

(c)  "Person" or "party" include any individual, corp-oration, partnership, association or other organized group of per-sons or legal successors or representatives of the foregoing;

(d)  "Records", "phonograph records" and "recordings" mean and include all forms of recording and reproductions, now known or which may hereafter become known, manufactured or sold primarily

-14-

for home use and/or jukebox use and/or use on transportation facilities, including, without limiting the generality of the foregoing, magnetic recording tape, film and any other medium or device for the reproduction of artistic performances manufactured or sold primarily for home use and/or jukebox use and/or use on transportation facilities, whether embodying:

(i)    sound alone; or

(ii)    sound synchronized with visual images, e.g., "sight and sound" devices;

(e)    "Wholesale price" means:

(i)    With respect to records sold hereunder for distribution in the United States of America, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of the royalties to be made pursuant to sub-paragraph 9 (a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us; and

(ii)    With respect to records sold hereunder for distribution outside the United States of America, one-half (½) of the suggested retail list price or applicable list price (less container charges and local taxes, if any), as the case may be, of such records in, at our election, the country of manufacture, the United States of America or the country of sale;

(f)    "Records sold" shall mean records shipped, paid for and not returned or exchanged. In the event records hereunder are shipped subject to a discount or merchandising plan, the number of records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of discount granted. In the event a discount is granted in the form of "free" or "bonus" merchandise, such "free" or "bonus" merchandise shall not be deemed included in the number of records sold. "Records sold" shall not include records given away or distributed for Fifty (50%) Per Cent or less of the regular wholesale price to distributors or others for promotion or exploitation purposes in connection with the inducement of sale of other records hereunder.

(g)    "Merchandising rights" shall mean and include all rights with respect to printed material, endorsements and merchandising of commercial tie-ups, in connection with the manufacture, advertising and sale of physical property, including without limitation, toys, novelties, books, paper cut-outs, activity books, etc.; an

-15-

(h)  As used in sub-paragraph 10(b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 10(b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we may be required to pay, as expenses, commissions or otherwise, to third persons in connection with such sales, all of which are to be computed in accordance with our standard accounting practices and procedures.

(i)  As used herein, "low-price" or "budget" labels shall mean any label used by us, our subsidiaries, affiliates, distributors or licensees, signifying that the records bearing such label carry a suggested retail list price substantially lower than the suggested retail list price for records bearing the standard label or labels used by us, our said subsidiaries, affiliates, distributors and/or licensees.

17.  No failure by us to perform hereunder, and no act or failure to act shall be deemed a material breach of this contract unless you shall first deliver to us, and to the record company principally distributing your recordings in the United States, a written notice specifying the alleged failure to perform or the alleged act or alleged failure to act constituting such material breach, and we shall have failed to cure any such material breach within thrity (30) days after receipt by us of such notice from you.  In the event we do not cure any such breach within the said thirty (30)-day interval, then it is specifically understood and agreed that this contract may be assigned to the said record company distributing your recordings in the United States, and such record company shall have an additional thirty (30)-day period to cure the said material breach in such event.

18.  Any option to extend the term of this agreement, as hereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least ten (10) days prior to the expiration of such term.  Such notice to you may be given by delivery to you by mailing to you at your address last known to us.  Such notice by mail shall be deemed to have been given on the date on which it is mailed.

-16-

19.  You grant to us the option to extend the term of this agreement for a first additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such period, the royalty rate set forth in Paragraph 7(a) hereof shall be    Seven (7%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

20.  If we have exercised the option granted in Paragraph 19 hereof, we shall have another option to extend the term of this agreement for a second additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be    Eight (8%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be eight (8).

21.  If we have exercised the option granted in Paragraph 20 hereof, we shall have another option to extend the term of this agreement for a third additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be    Nine (9%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

22.  If we have exercised the option granted in Paragraph 21 hereof, we shall have another option to extend the term of this agreement for a fourth additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be    Ten (10%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

-17-

23.  We shall have the sole and exclusive control of the distribution of phonograph records produced hereunder and shall have the right to distribute, market and exploit the same directly or through any subsidiary, affiliate or licensee of ours or through any franchise holder, distributor, licensee or other person throughout the world.

24.  It is acknowledged and agreed that certain recording costs and advances have not been recouped pursuant to a prior agreement with you with respect to which a release dated the 31st day of December , 1970, has been negotiated and executed by the parties thereto.  It is agreed that the amount of such recording costs and/or advances, to the extent not recouped pursuant to the said prior agreement, shall be deemed an advance against and recoupable from any and all royalties payable pursuant hereto.

25.  This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any other provision thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of or default under this agreement shall affect our rights or remedy in the event of any other default, whether or not similar.  The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of New York.

Very truly yours,

ASSORTED MUSIC, INC.

ACCEPTED AND AGREED:

By _~Leon Huff~_

_David Beasley_
David Beasley

_Clarence Vaughn_
Clarence E. Vaughn                          Parent or Guardian _William Vaughn Sr._

_James Tuten_
James Tuten                                 Parent or Guardian _Mrs. Jennie Holmes_

_Jennifer Holmes_
Jennifer Holmes                             Parent or Guardian_____
p/k/a "Ebonys"

Parent Or Guardian_____

<u>CERTIFICATE OF SERVICE</u>

Amended petition to cancel a trademark registration

Cancellation #92057071

July 8, 2013

Registrant

Mr. William H. Howard

104 So. Glenwood Avenue

Aldan, PA  19018-4016

Email address

Whoward123@comcast.net

**EXHIBIT C**

**Evidence Submitted by David S. Beasley**
**in**
**Cancellation No. 92057071**



June 7, 1996


Artist Right Enforcement Crop
250 W. 57th Street
Suite 520
New York, New York


Mr. Chuck Rubin,

    I am a member of the former singing group The Ebonys.  Attached is a  copy of my contract that was signed in January 1971.   I have been referred to you by Bernie Wilson (The BlueNotes), to address the issue of royalties.

    Attached find a list of songs that were released but not apart of the album, along with songs that were on the album.

    I have been intouch with Clarence Vaughn & Jennifer Holmes Rossi in reference to contacting you (members).  They are interested in hearing from you.  If I can be of further assistance, please contact me.

    Thank you in advance for your time.  Looking forward to hearing from you in the near future.


David Beasley

attachments

ALBUM TITLE:     THE EBONYS

SIDE I                                          SIDE II

HOOK UP AND GET DOWN                I'M SO GLAD I'M ME
IT'S FOREVER                                    I'LL TRY
LIFE IN THE CONTRY                         NATION TIME
SEXY WAYS                                       I BELIEVE
                                                       YOU'RE THE REASON WHY


45 RELEASES

2 WRONGS DON'T MAKE A RIGHT
DETERMINATION
SORRY WE COULDN'T MAKE IT
CHRISTMAS JUST AIN'T CHRISTMAS (Without the One you Love)


Compact Disc has been released in the States, also Japan - 1995
See attached

Platinum Classic Recording has a Groove Me album with Ebony Recording on it.

## Ebony Members

Mr. Clarence Vaughn
728 Bentley Road
Lindenwold, NJ   08021
609-783-7135

Mrs. Jennifer Holmes Rossi
3753 King Avenue
Pennsauken, NJ   08105
609-663-8419

Mr. David Beasley
612 Timber Creek Condos
Lindenwold, NJ   08021
609-784-3037

Mr. James Tooten (deceased 1995)

NICE PRICE LINE

# THE EBONYS

## エボニーズ

1. **HOOK UP AND GET DOWN** — 3:26
フック・アップ・アンド・ゲット・ダウン K. Gamble L. Huff
2. **IT'S FOREVER** — 7:19
イッツ・フォーエヴァー L. Huff
3. **LIFE IN THE COUNTRY** — 6:17
ライフ・イン・ザ・カントリー E. Life P. Terry T. Conway
4. **SEXY WAYS** — 3:08
セクシー・ウェイズ K. Gamble L. Huff C. Gilbert
5. **I'M SO GLAD I'M ME** — 3:03
アイム・ソー・グラッド・アイム・ミー K. Gamble L. Huff
6. **I'LL TRY** — 6:13
アイル・トライ L. Huff J. Whitehead G. McFadden
7. **NATION TIME** — 4:59
ネイション・タイム K. Gamble L. Huff
8. **I BELIEVE** — 4:32
アイ・ビリーヴ D. Graham J. Shirl A. Stillman
9. **YOU'RE THE REASON WHY** — 3:08
ユーア・ザ・リーズン・ホワイ K. Gamble L. Huff

プロデュース：P. テリー、E. ライフ、T. コンウェイ
……で収録されています。

エボニー「黒檀」といえば、黒人を象徴するものとしてしばしば語られてきた。同名の黒人雑誌がアメリカで長く続き、今なお発刊されていることをご存知の方も多いだろう。その雑誌については、中産階級向けだとか、インテリ向けだとか言われ、一部批判もあるようだが、そもそも本とか雑誌を読む層というのが、インテリに近い層なのだから、この批判はそう当たっていないようにも感じられる。

その"エボニー"が、70年代初期に黒人意識の高まりとともに、ちょっとしたブームとなった。エボニー・サウンズなるレーベルが作られたのもこの70年代初期だし、他にシカゴではそのものずばり、エボニーなるレーベルもなお活動を続けていた。そして、それをそのままグループ名にしてしまったやつらこそ、ここにお届けするエボニーズである。まず白人は絶対につけない黒々とした黒人による黒人のためのグループ。その彼らは、73年、一枚のアルバムによって突然頭角を現わす。

おなじみの、と形容すべきか、いうまでなく、と突き離して形容すべきか、とにかくソウルを多少かじったか、グループに興味を抱いたなら、必ずといってぶち当たる名、それがエボニーズである。だが、逆にこれほど知られていないグループも、またない。なにしろ、原盤LPがあまり売れなかったのか、お目にかかれる絶対量が極めて少ないのだ。その昔、CBSソニーで日本盤が出されたことはあるが、それも今残っている枚数はたかが知れたものだろう。そこで、ブートLPも作られ……いやいや腹を立てている場合じゃない。これを聞かれている方は少ないかもしれないが、雑誌媒体、あるいは口コミで広がった本当の名盤がいよいよ日本に登場するのだ。しかも、世界初のCD化というおまけも付いて。LPを聞くのは正直いって久しぶりなのだが、それを聞き直していると、つい言葉が出る、やっぱりスゲェーやこれは！と。こうした本当にいいアルバムを耳にすると気持も充実してくる。

が、不幸なことに、エボニーズに関する情報は極めて少ない。詳しいバイオくらい残されているだろうと、雑誌を探してみたがない。そういえば、昔もそうやって探してなかったんだっけ。唯一詳しい情報を提供してくれるのは、フィリー・ソウルのまとまった単行本として定評のあるトニー・カミングスの『ザ・サウンド・オブ・フィラデルフィア』のみである。

1人1人のキャリアすら、なぜそんなにあやふやなのだろう。まず、71年5月に第1弾シングル「ユーア・ザ・リーズン・ホワイ」がヒット、R&Bチャート10位、ポップ・チャート51位の成績を残す。続いて、第2弾「デターミネイション」もヒット、R&Bチャートで46位まで上がる。第3弾、4弾シングルは不発、第5弾の「イッツ・フォーエヴァー」が73年6月にヒット、R&Bチャート14位、ポップ・チャート68位の成績。他にこの時代にヒット曲2曲あり。決して悪い成績ではないように思える。それなのに、なぜアルバムは1枚のみ、かくも珍しいLPとなってしまったのか。彼らのことが知られていないのか。

それに対し、同じフィラデルフィア・インターナショナルからデビューしたハロルド・メルヴィン&ザ・ブルー・ノーツは「アイ・ミス・ユー」がR&Bチャート7位、続く第2弾の「二人の絆」が同じくR&Bチャート1位、ポップ・チャート3位の成績を修める。これだけで、後からデビューしたエボニーズは、ブルー・ノーツの物真似グループ、その言葉が悪ければ、後追いグループのように思われてしまったのだから、ついていないものだ。1位と10位との差、順位で書けばそうたいしたことはなさそうでも、この差は後々の彼らのキャリアに何十倍、いや何百倍の差となってはね返ってきてしまった。

たとえば、「イッツ・フォーエヴァー」という曲がある。ブルー・ノーツの「二人の絆」が不朽の名作というなら、この曲もまた不朽の名作というに値するすばらしい曲である。だが、この曲を憶えているアメリカ人が一体何人いるだろうか。わずかに、日本やイギリスに点在する"ソウル・ファン"という人たちに記憶されているにすぎないのである。あまりに残念ではないか。

この曲が初めてかかった時、黒人たちは恐らくその10年前に生まれたマーヴェレッツの「フォーエヴァー」を思い浮かべたに違いない。"ダーリン・フォーエヴァー……"と始まるマーヴィン・ゲイも歌っているあの曲のことだ。最初の雰囲気が似ていないこともない。これはこれを書いたレオン・ハフのモータウン・サウンドからの強い影響を物語るものといっていいと思うが、それはともかく、「イッツ・フォーエヴァー」は「フォーエヴァー」とは全く違ったように展開する。スウィートなコーラスに続いて出てくる力強いバリトン・ヴォイス、それにからむファルセットな見事さ。まさにスウィート・ソウルのエッセンスが詰まり切った"永遠"の曲といっていい。だが、「フォーエヴァー」はスタンダードとして今も語り継がれているのに、「イッツ・フォーエヴァー」は、一部の人たちの思い出の曲として生きているにすぎない。あー、とぼくはもう一度ここでため息をつく。

当初、この曲がブルー・ノーツの亜流のように思われたのは、結果としてリリースが遅れ、エボニーズが彼らの後塵を拝したからであった。だが、今聞いても、やはりエボニーズはエボニーズだ。女性が1人いるという編成上の違いを別にしても、彼らならではの持ち味がすごく出ている。ファルセットを含むコーラスは、あるいはブルー・ノーツ以上といっていいし、リードの声もテディ・ペンダーグラスとはかなり色合いが違う。テディ・ペンはデビュー当時からテルズのマーヴィン・ジュニアを思い起こさせてくれたが、エボニーズの方はもっとラフで、いってみれば田舎っぽい。ぼくにはマクファデン&ホワイトヘッドのラフ・ヴォイスが思い浮かんだ。要するに、彼らは同じフィラデルフィアでも、オージェイズ～ブルー・ノーツ、あるいはデルフォニックス～スタイリスティックスらの主流派のスタイルではなく、傍流に属するものだったのだろう。こうした幅の広さが、70年代のフィリー・サウンドの層の厚さでもあり、70年代グループの底の深いところである。

エボニーズはニュー・ジャージーのキャムデンで結成されたグループだ。ほとんど同じ場所で活動していた男3人、女1人が68年に結束して出来上ったのが、このエボニーズだった。ある夜、彼らが出演しているナイトクラブにレオン・ハフがやってきて彼らを見染め、契約となったのである。それが71年のことで、新しく始動したギャンブル＝ハフのレーベル・フィラデルフィア・インターナショナルの3枚目のリリースに選ばれたことでも、いかに期待されていたかがわかる。だが、LPが出されたのは、デビュー後2年たってから、つまり73年の……

ジェイムス・テューテン（Tuten）、クラレンス・ヴォーン、ジェニー・ホームズの4人。紅一点のジェニーは、後にクリーム・デ・ココアというやはりいかしたグループに参加しているのはよく知られたところ。

リリース状況は先に触れた通りだが、今一度原盤番号に沿って整理してみる。（いずれもPhiladelphia International）

P-3503 You're The Reason Why
Sexy Ways
P-3510 Determination
Do It
P-3513 Without The One You Love
Without The One You Love (inst.)
P-3514 I'm So Glad I'm Me
Do You Like The Way I Love
P-3529 It's Forever
Sexy Ways
P-3541 I Believe
Nation Time
P-3548 Life In The Country
Hook Up And Get Down

ご覧の通り、アルバムと見比べてみれば、何曲か洩れているものがあるが、それもいずれ何らかの形で紹介できる時があるはずである。

アルバムに目を戻してみる。まず、デビュー・ヒット(9)「ユーア・ザ・リーズン・ホワイ」がある。見事なバラードである。「イッツ・フォーエヴァー」に劣らぬ熱唱ぶり、ハーモニーである。これから見てみても、ギャンブル＝ハフがまずはバラード路線でヒットをねらっていたことは明らかである。このアルバムには収録されていないが、「デターミネイション」もそうだし、むろん「イッツ・フォーエヴァー」もそうだ。むしろ、これらを見習ってブルー・ノーツがデビューしたといえるかもしれない。

74年3月から小ヒットした(8)「アイ・ビリーヴ」もまたまたバラードで、いつものラフ・ヴォイスにもう1人のリードが加わり、さらにメロウな雰囲気を盛り上げている。ただし、これは大変有名な同名のゴスペル・ナンバーがあって、それの改作ナンバーのようだ。昔から伝わっているだけに、メロディが印象深いことは確かだが、こういう曲をシングル・リリースに選んでは、大ヒットは望めないかなと思ってしまう。

彼ら5番目のヒット（74年8月）となった(3)「ライフ・イン・ザ・カントリー」もバラード。これはファルセットを中心としていて、彼らとしては異色である。

結局ヒット曲5曲はいずれもバラードということになるが、それにはさまる曲には生きのいいアップ・テンポも多い。まず、(1)。例によって気持のいいフィリー・スタイルにダイナミックに声がかぶさる。だが、さらに出来のいいのは(4)「セクシー・ウェイズ」の方かもしれない。これがヒットしなかったのは不思議だが、74～75年に出されていれば、あるいは大ヒットしていたのではないか。どこまでもついていない彼らである。

(5)「アイム・ソー・グラッド・アイム・ミー」もダンス・テンポの隠れた名作。そして、やはり力の入ったバラード「アイル・トライ」へと続く。この曲は先に触れたマクファデン&ホワイトヘッドもライターに名を連ねている。そして、気持ちいい(7)。確かにダレた曲は1曲もない。名盤という言葉を迷うことなく使えるアルバムである。

彼らは、この後、76年にブッダに移り、シングル2枚とLP1枚を発表したが、一度傾いた運を立て直すことはできなかった。







Distributed by Collectables Records, Box 35, Narberth, PA 19072   © All rights reserved 1995
SEND FOR FREE CATALOG

## THE EBONYS - Golden Classics: Collectables 5659

The Ebonys have the distinction of scoring the first hit on Philadelphia International Records. The Camden, New Jersey, quartet was formed in the late '60s in their hometown, just across the Delaware River from Philadelphia. Initially restricted to playing local clubs, they got their big break when Leon Huff heard them perform.

Huff and his partner, Kenny Gamble, had already produced hits for artists like The Intruders and Jerry Butler. They had even tried to start a couple of their own labels, but were discouraged by the lack of promotion, especially after a bitter experience with Chess Records, which had handled their Neptune label.

Despite their problems with bigger companies, Gamble and Huff were still convinced their unique blend of funky rhythm and blues with sophisticated, highly orchestrated musical backgrounds could find a large audience. They finally signed with one of the biggest labels in the world, cutting a deal with Columbia Records in 1971 to distribute and market their Philadelphia International label.

The first few P.I. singles didn't set the charts on fire. But they did a lot better with Philadelphia International 3503. "You're The Reason Why" was written by Gamble and Huff and arranged by the accomplished Thom Bell. The dramatic ballad was a perfect vehicle for The Ebonys. It featured the haunting voice of Jennifer Holmes at the beginning of the song before she gave way to the rest of the group and their tormented emotionalism. Holmes, along with David Beasley, James Tuten and Clarence Vaughn, saw their powerful debut soar into the Billboard rhythm and blues Top 10 in the early summer of 1971. It also just missed the pop Top 50.

Gamble and Huff continued to work with their newest hitmakers, but subsequent singles didn't fare as well as their debut. The strong "Determination" (P.I. 3510) made it into the R&B Top 50 in late 1971. They did better with "It's Forever" (P.I. 3529), a classic soul ballad written by Leon Huff, that went to No. 14 on the R&B chart in the spring of 1973.

The group scored one more Philadelphia International hit. "Life In The Country" (P.I. 3548) went to No. 69 on the R&B charts in the fall of '74. Their one Philadelphia International album - "The Ebonys" - is the source for much of the material on this collection of their best work.

After leaving the Gamble-Huff operation, The Ebonys did score one more minor hit. They went to No. 83 in the fall of 1976 with "Making Love Ain't No Fun (Without The One You Love)" on Buddah 537.

After the hits slowed down The Ebonys drifted apart. But Jennifer Holmes did have another run of success as a member of the Philly-based quartet Creme D'Cocoa, which scored four hits in the late '70s for the Venture label. Their biggest success was "Doin' The Dog" (Venture 112), which went to No. 30 on the Billboard R&B chart.

While The Ebonys will always have the distinction of being the first hit act on Philadelphia International, it's clear from the material on this album that their success was no fluke. Jennifer Holmes and her three partners were fine singers and they did a very good job with the songs Gamble and Huff gave them. This is a tribute to the unique talent of both the singers and their producers.

--MARK MARYMONT

*Billboard chart numbers courtesy of Joel Whitburn's Record Research.*



SUPER HITS

INTRUDERS:
SUPER HITS

NICE PRICE LINE 30

PHILADELPHIA
INTERNATIONAL RECORDS
SERIES

¥ 1,800 （税込）
好評発売中

THE EBONYS

HAROLD MELVIN & THE BLUE NOTES

360 DEGREES OF BILLY PAUL

BILLY PAUL

IN PHILADELPHIA

THE O'JAYS

**8. I BELIEVE**

**9. YOU'RE THE REASON WHY**



1973   THE EBONYS



DAVID BEASLEY

CLARENCE VAUGHN

WILLIAM TUTEN

JENNIFER HOLMES ILD221

1973

**THE EBONYS**





 

TMSM-01

### NEW JERSEY DEPARTMENT OF STATE
### DIVISION OF COMMERCIAL RECORDING
### ORIGINAL APPLICATION TO REGISTER
### A TRADE OR SERVICE MARK

*This form may be used by applicants seeking to register a State trade or service mark pursuant to NJSA 36. Applicants are responsible for strict adherence to all requirements set forth in State law.* **(PLEASE REFER TO INSTRUCTIONS ON REVERSE SIDE)**

1. **Mark Type: (check one)** _____ **Trade Mark** __XXXX__ **Service Mark**

2. **Name and Description of Mark:** (list the term that constitutes the mark or, in the case of a design mark, provide a brief description of its appearance)

   THE EBONY'S

3. **Description Of The Goods Or Services Involved:**

   ENTERTAINMENT/SINGING

4. **Classification Number(s):** (Minimum of one)

5. **Applicant Information:**

   a. Name: DAVID S. BEASLEY
   b. Business Address: 612 TIMBERCREEK CONDOS
   LINDENWOLD, NJ 08021
   c. Applicant is: (check one) __xx__ An Individual ____ Corporation ____ Partnership ____ Other Business Entity
   d. If applicant is a corporation, partnership or other business entity, list the home state:
   N/A
   e. If applicant is a partnership, list the names of all general partners:
   N/A

6. **Assignee Information:** (if applicable, provide assignee name/address)

   a. Name: N/A
   b. Address:

7. **Dates:** Date First Used in New Jersey (must be entered) __1969__ Date First Used Elsewhere: __1969__

8. **Signature(s) and Statement of Ownership:** (verification required)

   The applicant attests that he or she is the owner of the mark, and that the mark is in use in this State, and that, to his or her knowledge, no other person has registered the mark, either with the US Patent and Trade Mark office or with the Secretary of State, or has the right to use the mark or a mark in such near resemblance as to be likely, when used in connection with the goods or services of such other person, to cause confusion, to to cause mistake, or to deceive.

   _David Beasley_                              _5/16/97_
   (Signature of Applicant, or a Member of the Firm,        (Date)
   or an Officer of the Corporation or Business Applying)

   _____              _____
   (Assignee, if Applicable)                     (Date)

   Subscribed and sworn to before me, _Rose D. Giuffre_, a Notary Public,
   this __16th__ day of _May_ A.D. 19_97_.

   _Rose D. Giuffre_                     **"ROSE D. GIUFFRE**
   (Notary Public)                       **Notary Public of New Jersey**
                                         **My Commission Expires 11/28/98"**

   *Note: Attach to this application: 1) a drawing of the mark; and 2) three (3) specimens showing the mark as actually used.*

I, THE TREASURER THE STATE OF NEW JERSEY,   DO HEREBY
CERTIFY THAT

        DAVID S. BEASLEY
        612 TIMBER CREEK CONDOS
        LINDENWOLD  NJ  08021

DID ON THE 7TH DAY OF MARCH     A.D. 2003 FILE IN THIS
DEPARTMENT
        SERVICE MARK
        MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :   041  EDUCATION AND ENTERTAINMENT

RENEWAL DATE:                03/19/2013
EXPIRATION DATE:             03/07/2018
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:       01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.



IN TESTIMONY WHEREOF, I HAVE
HEREUNTO SET MY HAND AND AFFIXED
MY OFFICIAL SEAL AT TRENTON, THIS
  19TH DAY OF    MARCH
A.D.   2013 .

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certificate Number:   127767183

Verify this certificate online at

http://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp





**Philadelphia
International
Records**

May 20, 2010


The Ebonys
c/o David Beasley
1801 Laurel Road
Lindenwold, NJ 08021


**Re: Royalty Statement for PE 12/31/09**


Mr. Beasley,

Enclosed please find the most current Ebonys Royalty Statement for *Period Ending December 31, 2009* for The Ebonys. Thank you for providing us the necessary contact information needed for future Ebonys royalty statements. Pursuant to our email and phone correspondence, it is our understanding that you are an official and legal representative of the group and are authorized to receive information on the group's behalf.

For any further questions, please give us a call at (215) 985-0900.



Sincerely,

Charles B. Gamble
Executive Vice President
Philadelphia International Records


Cc: Royalty Administration

ASSORTED MUSIC, INC.
250 South Broad Street
Philadelphia, Pennsylvania  19102



January 1, 1971

Messrs. David Beasley, Clarence
E. Vaughn, James Tuten and
Miss Jennifer Holmes
p/k/a "Ebonys"
c/o Gerald Wilson
403 Parry Road
Cinnaminson, New Jersey

Dear Sirs and Miss Holmes:

The following, when signed by you and us, will consti-
tute the agreement between you and us, pursuant to which you will
perform exclusively for us as a recording artist, upon the terms
and conditions herein set forth:

1.  This agreement shall commence as of the date Janu-
ary 1, 1971,    and shall continue in force for a term which shall
consist of an initial period of  one (1) year    from such date, and
the additional period or periods, if any, by which such term may
be extended through our exercise of one or more of the options
granted to us herein.

2.  During the term of this agreement, you will render
your services at recording sessions at studios selected by us, at
times and places to be designated by us, for the purpose of making
phonograph records.  The musical compositions to be recorded shall
be designated by us, and each master recording made hereunder shall
be subject to our approval as satisfactory for the manufacture
and sale of records.  During the initial period of the term hereof,
you will perform for the recording of satisfactory master record-
ings which shall consist of a minimum of  four (4)     45 r.p.m.
sides, or their equivalent, and we will record your performances.
Additional master recordings shall be performed by you and recorded
by us at our election.

-2-

3.   During the term of this agreement you will not perform for the purpose of making phonograph records or master recordings for any person other than us, and during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not perform any musical composition which shall have been recorded hereunder for any person other than us for the purpose of making phonograph records or master recordings.  It is agreed between you and us that your services to be rendered hereunder are of a special, unique, unusual, extraordinary and intellectual character, involving skill of the highest order, which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law, and that your breach of any of the provisions contained in this agreement shall cause us irreparable damage and injury.  You hereby expressly agree that we will be entitled to injunctive relief and other equitable relief to prevent or cure any breach or threatened breach of this agreement by you.

4.   All master recordings recorded hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our property, free from any claims whatsoever by you or any person deriving any rights or interests from you.  Without limiting the generality of the foregoing, we and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture by any method now or hereafter known phonograph records and other reproductions on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell, transfer or otherwise deal in the same throughout the world under any trademark, trade name and label, or to refrain from such manufacture, sale and dealing.

5.   At our election, all compositions recorded pursuant to this or any other agreement between you and us which are written or composed by you or owned or controlled by you or any party which is allied or affiliated with you or in which you have a direct or indirect interest, shall be licensed to us at a royalty rate of 1-1/2        cents per 45 r.p.m. record side, or its equivalent, on the basis of Ninety (90%) Per Cent of net sales of records, except that (i)  with respect to records sold

-3-

and/or distributed as "bonus" or "free" records through "Club Operation" (as defined in sub-paragraph 8 (b) of this agreement), the royalty rate shall be three-fourths (3/4ths) of the rate set forth above, payable on the basis of Ninety (90%) Per Cent of net sales of records; and (ii) no copyright royalties shall be payable with respect to records described in sub-paragraph 8 (f) hereof. Arranged versions of musical compositions in the public doman, when furnished by you or any party described above for recordings hereunder, shall be free of copyright royalties. Any assignment made of the ownership or copyright in any such composition or in any such arranged version of a musical composition in the public domain shall be made subject to the provisions hereof. In the event we are required to pay mechanical copyright royalties in excess of those provided in this Paragraph 5, we shall have the right to charge such excess against all royalties or other sums payable to you hereunder.

6. (a) For your services rendered hereunder, and for the rights granted herein to us, we will make a non-returnable payment to you, within fourteen (14) days after the services are rendered at each recording session, at the rate of union scale; and each such payment shall constitute an advance and shall be charged against your royalties under this and/or any other agreement between you and us, if and when earned. Without limiting the generality of the foregoing, included amont payments which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by us pursuant to the requirements of any collective bargaining agreement between us and any union representing you for performances hereunder.

(b) We shall specify your accompaniment (instrumental and vocal), arrangements and copying and studio charges and/or rentals in respect of master recordings made hereunder, and we shall pay the costs of such accompaniment as well as the costs of such arrangements and copying and studio charges and/or rentals which are specifically undertaken in respect of such master recordings (such costs are hereinafter collectively referred to as "Accompaniment Costs"); and all such Accompaniment Costs so paid by us shall constitute advances and shall be charged against your royalties earned. Without limiting the generality of the foregoing, including among Accompaniment Costs,

-4-

which shall hereunder constitute advances chargeable against roy-
alties, shall be all amounts which are paid by us pursuant to the
requirements of any collective bargaining agreements between us
and any union representing other persons who render services here-
under or in connection with any accompaniment (instrumental and
vocal), arrangements and copying and studio charges and/or rentals
for performances hereunder.

7.   (a)  We will pay you a basic royalty of (i) Six (6%)
Per Cent of the applicable wholesale price (less all taxes) in
respect of Ninety (90%) Per Cent of all phonograph records consist-
ing entirely on both sides thereof a composition or compositions
performed by you and recorded hereunder, manufactured and sold by
us or by any subsidiary, affiliate or licensee to whom we have sup-
plied a copy or duplicate of a master or a matrix of or embodying
such composition or compositions; and (ii)  one-half (½) of such
percentage of the applicable wholesale price (less all taxes) in
respect of Ninety (90%) Per Cent of all phonograph records consist-
ing entirely of such composition or compositions on only one side
thereof, so manufactured and sold.  In computing the number of
records manufactured and sold hereunder, we shall have the right
to deduct returns and credits of any nature, including, without
limitation, those on account of One Hundred (100%) Per Cent return
privileges, defective merchandise, exchange privilege, promotional
credits, error in billing, usable overstock and error in shipment.

(b)  Royalties for records sold for distribution
outside of the United States of America shall be computed in the
national currency, at our election, of the country of manufacture,
the country of sale of the United States of America, and as to
sales made for distribution outside of the United States of America,
shall be paid at the same rate of exchange as we are paid; pro-
vided, however, that royalties on records sold for distribution
outside of the United States of America shall not be due and
payable until payment therefor has been received by us in the
United States of America, and provided further, that if we do not
receive payment in United States dollars currently and elect to
accept payment in a foreign currency, we may deposit to your ac-
count (and at your expense) in such currency in a depository
selected by us, all payments so received as royalties applicable
to this agreement, and shall notify you thereof promptly.  Such
deposit, as above stated, shall fulfill our obligation hereunder

as to record sales to which such royalty payments are applicable.

(c) With respect to any master recording embodying your performance hereunder, together with the performance of another artist or artists to whom we are obligated to pay royalties in respect of phonograph records embodying the joint performances contained on such master recording:

(i)   the royalty rate to be used in determining the royalties payable to you in respect of such master recording shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on such master recording; and

(ii)   in determining the portion of the Accompaniment Costs applicable to such master recording which shall be charged against your royalties if and when earned, such portion shall be computed by multiplying the aggregate amount of such Accompaniment Costs by the same fraction used in determining the royalties payable to you in respect of such master recording.

(d)  With respect to a side of a long-playing (33-1/3 r.p.m.) or extended-play microgroove record, which embodies on such side performances contained on another master recording(s) in addition to the performances contained on a master recording(s) recorded hereunder, the royalty payable to you in respect of such record side shall be computed by basing the rate provided in sub-paragraph 7(a) (ii) (or other applicable rate) upon that proportion of the applicable wholesale price (less all taxes) of such record that the number of 45 r.p.m. sides required to embody your performances recorded hereunder on such record side bears to the total number of 45 r.p.m. sides required to embody the total number of performances on such record side.

(e)  With respect to all phonograph records sold hereunder, royalties on phonograph records included in albums, jackets, cartridges, cassettes, boxes or any other type of package or container (herein collectively referred to as "container(s)") shall be

based solely upon the applicable wholesale price of such phonograph records in containers less all taxes and also less a container charge not to exceed Ten (10%) Per Cent of the applicable price of disc phonograph records and Twenty-five (25%) Per Cent with respect to all other forms of records as defined in sub-paragraph (e) (i) or (e) (ii), as the case may be, of Paragraph 16 hereof.

8.   Notwithstanding anything to the contrary contained in this or any other agreement between you and us, the following shall apply with respect to phonograph records manufactured pursuant to this or any other such agreement and sold and/or distributed in the manner set forth hereinbelow:

(a)   In respect of phonograph records sold for distribution outside of the United States of America, the royalty rate payable to you therefor shall be equal to one-half (½) of the applicable royalty rate which would have been payable to you therefor if such records had been sold for distribution in the United States of America.

(b)   In respect of phonograph records sold through any direct mail order operation or through any direct sales-to-consumer operation carried on by us, our subsidiaries, affiliates or licensees including, without limitation, any Record or Tape Club (herein collectively referred to as "Club Operation"), the royalty rate shall be one-half (½) of the otherwise applicable royalty rate.  Notwithstanding the preceding sentence, if such phonograph records are sold through any such Club Operation at a price (excluding postage and handling charges) of One ($1.00) Dollar or less, the royalty rate payable to you in respect of such phonograph records if they had been sold through such Club Operation at a price of more than One ($1.00) Dollar and, notwithstanding anything to the contrary contained in this agreement, such royalty rate shall be computed on the basis of the actual sales price charged by such Club Operation for such phonograph records (excluding postage and handling charges). Notwithstanding anything contained in the foregoing two sentences or elsewhere in this agreement, no royalty shall be payable to you with respect to (i)  phonograph records which are received

by members of any such Club Operation, either in an introductory offer in connection with such Club Operation or upon recommending that another join such Club Operation and/or as a result of the purchase of a required number of records, including, without limitation, records distributed as "bonus" and/or "free" records, or (ii) phonograph records for which such Club Operation is not paid.

(c) In respect of phonograph records sold to our clients for promotional, sales incentives or educational purposes or phonograph records sold to educational institutions or libraries, the royalty rate payable to you therefor shall be one-half (1/2) the royalty rate otherwise payable and shall be computed on the basis of the actual sales price therefor (less all taxes and container charges) to any of the foregoing.

(d) In respect of phonograph records sold in the form of pre-recorded tape, the royalty rate payable to you therefor shall be one-half (1/2) of the applicable royalty rate otherwise payable if such record(s) were sold in disc form.

(e) In respect of phonograph records sold on a "low-price" or "budget" label, the royalty rate shall be one-half (1/2) the applicable rate otherwise payable.

(f) No royalty shall be payable to you in respect of phonograph records sold as "cut-outs" after the listing of such records has been deleted from our catalog or in respect of phonograph records distributed as "free" or "no-charge" records or records sold and/or distributed to radio stations or for use on transportation facilities to promote or stimulate the sale of phonograph records embodying your performances.

9. In respect of the royalties provided for herein:

(a) We will compute royalties payable to you hereunder within sixty (60) days after June 30 and after December 31 of each year during which records made hereunder are sold for the preceding six (6)-month period, and will render accountings for and pay such royalties, less any unrecouped advances under this and/or any other agreement between you and us, within such sixty (60) days, except as provided in sub-paragraph 7(b) hereof, and except with respect to sales of records upon which royalties are payable to us by a distributor thereof. We shall be responsible for payment of your royalties on such sales only after receipt by us from such distributor of the royalties applicable to such sales.

-8-

(b)  All royalty statements and all other accounts rendered by us to you hereunder shall be binding upon you and not subject to any objection by you for any reason whatsoever, unless specific objection in writing, stating the basis thereof, is given to us within six (6) months from the date rendered. Notwithstanding anything to the contrary contained herein, we shall be under no obligation to account to you in respect of, and/or pay to you, sums of Fifty ($50.00) Dollars or less, unless we receive a written demand from you for such an accounting and payment.

10.  (a)  We shall have the right to use and to allow others to use your name and likeness and biographical material concerning you for advertising and purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artists and products.  We shall not use or authorize any direct endorsement by you of any record or performance without your prior written consent.  During the term of this agreement, you shall not endorse or authorize your name or likeness to be used in connection with the advertising or sale of products in the same category as those which are currently manufactured and sold by or for us.

(b)  Without limiting the provisions of sub-paragraph 10(a) hereof, you hereby grant to us, during the term of this agreement, the exclusive right, throughout the world, to authorize the use of your name and/or likeness and/or biographical material concerning you, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (herein collectively referred to as "sale(s)") of merchandising rights and to enter into agreements covering such sales.  It is expressly understood and agreed that any contract entered into by us for such a sale during the term of this agreement shall continue in full force and effect in accordance with the provisions thereof, but after the termination of the term of this agreement, we shall have no right to enter into a new contract to make any new sale authorizing the use of your name and/or likeness after the termination of the term of this agreement.  For the rights granted by this sub-paragraph we will pay you, in United States dollars, Fifty (50%) Per Cent of the net monies earned and received by us in the United States of America from such sales of merchandising rights authorizing the use of your name and/or likeness and/or biographical material concerning you pursuant to this agreement.

-9-

(c) You warrant and represent that you own all rights in and to the name "Ebonys" (hereinafter referred to as the "Name"), and that you have the sole and exclusive right to use and to allow others to use the Name in connection with the manufacture, advertising and sale of phonograph records. You hereby grant to us, and further warrant and represent, that we shall have the right to use and to allow others to use the Name for advertising and purposes of trade and otherwise without restriction in connection with the phonograph records made pursuant to this agreement and in advertisements for our company, its artist and products and exclusively in connection with the merchandising rights to the same extent and on the same terms and conditions as set forth herein with respect to your names. It is understood and agreed that (i) during the term of this agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) for the purpose of making phonograph records for any person other than us, and (ii) during a period of five (5) years after the expiration of the term of this agreement, for any reason whatsoever, you will not authorize or knowingly permit the performance by any person or persons who shall in any way be identified with the Name (or any name substantially similar thereto) of any compositions recorded hereunder for any person other than us for the purpose of making phonograph records. It is further understood and agreed that you will not at any time manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying (i) the performances by any person or persons rendered during the term of this agreement, or (ii) the performance by any person or persons of a composition recorded hereunder rendered within five (5) years after the expiration of the term of this agreement, which phonograph records and/or performances shall in any way be identified with the Name or any name substantially similar thereto. You acknowledge that any use of the Name (or any name substantially similar thereto) contrary to the provisions hereof would cause us irreparable injury, and you agree to use your best efforts in assisting us to prevent any such use.

(d) In the event that during the term of this agreement any artist shall leave the group hereunder identified with the Name and/or shall cease to perform as a member of such group, you shall promptly give us notice in writing to such effect and in the event we shall deem it advisable, such leaving member shall be replaced by a new member who shall be mutually acceptable; and the

-10-

name of such new member shall thereafter be deemed substituted in
this agreement in the place of such leaving member, and such new
member, by performing hereunder, shall automatically be bound by
all the terms and conditions of this agreement. Upon our request
therefor, the remaining members of the group will duly cause any
such new member to execute and deliver to us such document as we,
in our judgment, may deem necessary or expedient to carry out or
effectuate the purpose or intent of the foregoing sentence. Such
leaving member shall thereafter be relieved from further perform-
ances hereunder with the group, but shall continue to be bound
individually by the applicable provisions of this agreement in-
cluding, without limitation, the provisions set forth in sub-
paragraphs 10(e) and 3 hereof.

(e)  You warrant and represent that, in the event
any one or more of the artists shall so leave the group as pro-
vided in sub-paragraph 10(d) hereof, we shall have, and you and
each of you does hereby grant to us, and irrevocable option on
your individual and exclusive services for the purpose of making
phonograph records. Such option, with respect to any such leav-
ing member, may be exercised by us by giving such leaving member
notice in writing within ninety (90) days after our receipt of
the notice provided for in said sub-paragraph 10(d); and, in the
event of our such exercise of option, such leaving member shall
execute our then current standard form of term recording contract
containing the following provisions:

(i)  a term consisting of not less than the
remaining balance of the term of this agreement as it may be ex-
tended by our exercise of the options granted to us herein;

(ii)  a minimum of  four (4)   45 r.p.m.
record sides or their equivalent for which satisfactory master re-
cordings will be performed and recorded during each year of such
term, it being understood and agreed that if the remaining balance
of the term of this agreement shall be less than six (6) months,
then the minimum number of such 45 r.p.m. record sides for which
master recordings will be performed and recorded during such re-
maining balance of the term shall be one-half (½) of the foregoing
number;

(iii)  a royalty in respect of phonograph re-
cords embodying performances recorded during such term at the rates
set forth in Paragraphs 7 and 8 of this agreement; and

-11-

(iv)  a payment for services rendered at each recording session at the rate of union scale, which payment shall constitute advances chargeable against such royalties.

In the event that during the term of this agreement the group shall completely disband, you shall promptly give us notice in writing to such effect, and, in such event, the provisions of this sub-paragraph 10(e) shall be applicable with respect to each member of the group.

(f)  As to all matters contained in this agreement to be determined by mutual agreement between you and us, or as to which your approval or consent is required, you shall not unreasonably withhold such agreement, approval or consent.  Your duties, liabilities, obligations, warranties, representations, authorizations and agreements contained in this agreement are joint and several and all references herein to "you" and "your" in connection therewith shall include all of you inclusively and each of you individually, unless otherwise specified.

11.  You will not, at any time, manufacture, distribute or sell or authorize or knowingly permit the manufacture, distribution or sale by any person other than us of phonograph records embodying:

(a)  any performance rendered by you during the term of this agreement; or

(b)  any performance rendered by you within five (5) years after the expiration of the term of this agreement of a composition which shall have been recorded pursuant to this agreement.

You will not record or authorize or knowingly permit to be recorded for any purpose any such performances without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than us of phonograph records embodying such performances.  Specifically, without limiting the generality of the foregoing, you agree:

(a)  if, during the term of this agreement you perform for the purpose of making transcriptions for radio or television or soundtracks for motion picture films; or

(b)  if, within five (5) years after the expiration of the term of this agreement you perform for any such purpose any composition which shall have been recorded pursuant to this agree-

-12-

you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records.

You will promptly furnish to us, at our Philadelphia office, a copy of the pertinent provisions of each such contract and will cooperate fully with us in any controversy which may arise or litigation which may be brought relating to our rights under this paragraph.

12. You warrant and represent that you are under no disability, restriction or prohibition in respect of (a) your right to execute this agreement and perform its terms and conditions, and more particularly, (b) your right to perform for the recording of any and all compositions hereunder, except to the extent, if any, set forth in Schedule I attached hereto and made a part hereof. You agree to and do hereby indemnify, save and hold us harmless from loss or damage (including reasonable attorneys fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties or representations made by you in this agreement. You will reimburse us on demand for any payment made by us at any time after the date hereof in respect of any liability or claim to which the foregoing indemnity relates.

13. We may, at our election, assign this agreement or any of our rights hereunder.

14. (a) You warrant and represent that you are now a member in good standing of the American Federation of Television and Radio Artists, or will become a member within thirty (30) days after your first engagement with us, and that you will remain so during the term of this agreement.

(b) The provisions of the AFTRA National Code of Fair Practice for Phonograph Recordings are made a part of this agreement with the same force and effect as if fully set forth herein.

(c) If, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of Paragraph 2 hereof or, if due wholly or partly to any labor controversy or adjustment thereof, or to any other cause not entirely within our control, or which we could not, by reasonable

-13-

diligence, have avoided, we are materially hampered in the record-
ing, manufacture, distribution or sale of records, or our normal
business operations become commercially impractical, then, without
limiting our rights in any such event, we shall have the option,
without liability, to suspend operation of Paragraph 2 and/or sub-
paragraph 9 (a) of this agreement for the duration of any such con-
tingency by giving you written notice thereof; and at our election,
a period of time equal to the duration of such suspension shall be
added at the end of the then current period of the term hereof, and
then such period and the term of this agreement shall be accordingly
extended.

15. If, during the term of this agreement we fail, ex-
cept for reasons set forth in Paragraph 14 hereof, to record master
recordings constituting the minimum number of record sides provided
for herein and, if within thirty (30) days after the expiration of
the term hereof you shall notify us by registered mail of your re-
quest that we record such of your performances as well as fulfill
our minimum obligation hereunder, then we shall, at our option, with-
in sixty (60) days after our receipt of such request, either record
such performances or pay you at the rate of union scale in full set-
tlement of our obligation in connection therewith. In the event
that you do not so notify us within such thirty (30)-day period,
then we shall be under no obligation to you for failure to record
master recordings constituting such minimum number of record sides.

16. For purposes of this agreement:

(a) "Master recording" means any original recording,
whether on magnetic tape or wire, a laqueur or wax disc, or on any
other substance or material, whether now known or unknown, which
is used in the manufacture of phonograph records;

(b) "Matrix" means any dye or mold or device which
is now or hereafter used, directly or indirectly, in the manufac-
ture of phonograph records and which is made from master recordings;

(c) "Person" or "party" include any individual, corp-
oration, partnership, association or other organized group of per-
sons or legal successors or representatives of the foregoing;

(d) "Records", "phonograph records" and "recordings"
mean and include all forms of recording and reproductions, now known
or which may hereafter become known, manufactured or sold primarily

-14-

for home use and/or jukebox use and/or use on transportation facilities, including, without limiting the generality of the foregoing, magnetic recording tape, film and any other medium or device for the reproduction of artistic performances manufactured or sold primarily for home use and/or jukebox use and/or use on transportation facilities, whether embodying:

(i)   sound alone; or

(ii)   sound synchronized with visual images, e.g., "sight and sound" devices;

(e)   "Wholesale price" means:

(i)   With respect to records sold hereunder for distribution in the United States of America, the average net price received from distributors for our phonograph records during the six-month period immediately preceding the applicable accounting period for the computation of the royalties to be made pursuant to sub-paragraph 9 (a) hereof, it being understood that a separate calculation of the average wholesale price shall be made for each price category of phonograph records manufactured and sold by us; and

(ii)   With respect to records sold hereunder for distribution outside the United States of America, one-half (½) of the suggested retail list price or applicable list price (less container charges and local taxes, if any), as the case may be, of such records in, at our election, the country of manufacture, the United States of America or the country of sale;

(f)   "Records sold" shall mean records shipped, paid for and not returned or exchanged. In the event records hereunder are shipped subject to a discount or merchandising plan, the number of records deemed to have been sold shall be determined by reducing the number of records shipped by the percentage of discount granted. In the event a discount is granted in the form of "free" or "bonus" merchandise, such "free" or "bonus" merchandise shall not be deemed included in the number of records sold. "Records sold" shall not include records given away or distributed for Fifty (50%) Per Cent or less of the regular wholesale price to distributors or others for promotion or exploitation purposes in connection with the inducement of sale of other records hereunder.

(g)   "Merchandising rights" shall mean and include all rights with respect to printed material, endorsements and merchandising of commercial tie-ups, in connection with the manufacture, advertising and sale of physical property, including without limitation, toys, novelties, books, paper cut-outs, activity books, etc.; an

-15-

(h) As used in sub-paragraph 10(b) hereof, "net monies earned and received" shall mean the total amount received by us pursuant to sales (as that term is defined in sub-paragraph 10(b) hereof) of merchandising rights hereunder, after the deduction of all direct costs, expenses and commissions attributable to such sales, and after the deduction of any amounts which we may be required to pay, as expenses, commissions or otherwise, to third persons in connection with such sales, all of which are to be computed in accordance with our standard accounting practices and procedures.

(i) As used herein, "low-price" or "budget" labels shall mean any label used by us, our subsidiaries, affiliates, distributors or licensees, signifying that the records bearing such label carry a suggested retail list price substantially lower than the suggested retail list price for records bearing the standard label or labels used by us, our said subsidiaries, affiliates, distributors and/or licensees.

17. No failure by us to perform hereunder, and no act or failure to act shall be deemed a material breach of this contract unless you shall first deliver to us, and to the record company principally distributing your recordings in the United States, a written notice specifying the alleged failure to perform or the alleged act or alleged failure to act constituting such material breach, and we shall have failed to cure any such material breach within thrity (30) days after receipt by us of such notice from you. In the event we do not cure any such breach within the said thirty (30)-day interval, then it is specifically understood and agreed that this contract may be assigned to the said record company distributing your recordings in the United States, and such record company shall have an additional thirty (30)-day period to cure the said material breach in such event.

18. Any option to extend the term of this agreement, as hereinafter in this agreement granted to us, may be exercised by us by giving you notice in writing at least ten (10) days prior to the expiration of such term. Such notice to you may be given by delivery to you by mailing to you at your address last known to us. Such notice by mail shall be deemed to have been given on the date on which it is mailed.

-16-

19.  You grant to us the option to extend the term of this agreement for a first additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such period, the royalty rate set forth in Paragraph 7(a) hereof shall be   Seven (7%)        Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

20.  If we have exercised the option granted in Paragraph 19 hereof, we shall have another option to extend the term of this agreement for a second additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be   Eight (8%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be eight (8).

21.  If we have exercised the option granted in Paragraph 20 hereof, we shall have another option to extend the term of this agreement for a third additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be   Nine (9%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

22.  If we have exercised the option granted in Paragraph 21 hereof, we shall have another option to extend the term of this agreement for a fourth additional period of one year upon all the terms and conditions herein contained, except that in respect of compositions performed by you and recorded by us during such additional period, the royalty rate set forth in Paragraph 7(a) hereof shall be   Ten (10%)       Per Cent in lieu of the rate therein set forth, and the minimum number of sides shall be   eight (8).

-17-

23.   We shall have the sole and exclusive control of the distribution of phonograph records produced hereunder and shall have the right to distribute, market and exploit the same directly or through any subsidiary, affiliate or licensee of ours or through any franchise holder, distributor, licensee or other person throughout the world.

24.   It is acknowledged and agreed that certain recording costs and advances have not been recouped pursuant to a prior agreement with you with respect to which a release dated the 31st day of December    , 1970, has been negotiated and executed by the parties thereto.  It is agreed that the amount of such recording costs and/or advances, to the extent not recouped pursuant to the said prior agreement, shall be deemed an advance against and recoupable from any and all royalties payable pursuant hereto.

25.   This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any other provision thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of our company. No waiver of any provision of or default under this agreement shall affect our rights or remedy in the event of any other default, whether or not similar.  The validity, construction and effect of this agreement, and any and all extensions and/or modifications thereof, shall be governed by the laws of the State of New York.

                                    Very truly yours,

                                    ASSORTED MUSIC, INC.

ACCEPTED AND AGREED:

_David Beasley_                      By _Leon Huff_
David Beasley

_Clarence Vaughn_                    Parent or Guardian _William Vaughn Sr._
Clarence E. Vaughn

_James Tuten_                        Parent or Guardian _Mrs. Jennie Holmes_
James Tuten

_Jennifer Holmes_                    Parent or Guardian _____
Jennifer Holmes
p/k/a "Ebonys"

                                    Parent Or Guardian _____

## CERTIFICATE OF SERVICE

Amended petition to cancel a trademark registration
Cancellation #92057071
July 8, 2013

Registrant
Mr. William H. Howard
104 So. Glenwood Avenue
Aldan, PA  19018-4016

Email address
Whoward123@comcast.net



I, THE TREASURER THE STATE OF NEW JERSEY,  DO HEREBY
CERTIFY THAT

        DAVID S. BEASLEY
        612 TIMBER CREEK CONDOS
        LINDENWOLD  NJ  08021

DID ON THE 7TH DAY OF MARCH    A.D. 2003 FILE IN THIS
DEPARTMENT
        SERVICE MARK
        MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :   041  EDUCATION AND ENTERTAINMENT

RENEWAL DATE:                  03/19/2013
EXPIRATION DATE:               03/07/2018
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:          01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.



IN TESTIMONY WHEREOF, I HAVE
HEREUNTO SET MY HAND AND AFFIXED
MY OFFICIAL SEAL AT TRENTON, THIS
  19TH DAY OF     MARCH
A.D.    2013 .

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certificate Number:   127767183

Verify this certificate online at

http://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp



I, THE TREASURER THE STATE OF NEW JERSEY, DO HEREBY CERTIFY THAT

    DAVID S. BEASLEY
    612 TIMBER CREEK CONDOS
    LINDENWOLD NJ 08021

DID ON THE 7TH DAY OF MARCH    A.D. 2003 FILE IN THIS DEPARTMENT

    SERVICE MARK
    MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :   041   EDUCATION AND ENTERTAINMENT

RENEWAL DATE:               04/17/2008
EXPIRATION DATE:         03/07/2013
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:      01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.

            IN TESTIMONY WHEREOF, I HAVE
            HEREUNTO SET MY HAND AND AFFIXED
            MY OFFICIAL SEAL AT TRENTON, THIS
            17TH DAY OF APRIL
            A.D. 2008.



            R. David Rousseau
            State Treasurer

I, THE TREASURER THE STATE OF NEW JERSEY, DO HEREBY
CERTIFY THAT

          DAVID S. BEASLEY
          612 TIMBER CREEK CONDOS
          LINDENWOLD  NJ  08021

DID ON THE 7TH DAY OF MARCH     A.D. 2003 FILE IN THIS
DEPARTMENT

          SERVICE MARK
          MARK REG NUM : 21286
THE EBONYS
ENTERTAINMENT/SINGING GROUP

CLASSIFICATION GROUP : SERVICES
CLASS :    041  EDUCATION AND ENTERTAINMENT

REGISTRATION DATE:              03/07/2003
EXPIRATION DATE:                03/07/2008
DATE OF FIRST USE IN NEW JERSEY: 01/01/1969
DATE IN USE ELSEWHERE:          01/01/1969

AS BY THE STATUTES OF THIS STATE REQUIRED.

                    IN TESTIMONY WHEREOF, I HAVE
                    HEREUNTO SET MY HAND AND AFFIXED
                    MY OFFICIAL SEAL AT TRENTON, THIS
                    7TH DAY OF MARCH
                    A.D. 2003.

                    John E McCormac, CPA
                    State Treasurer



# Octagon Development Group Entertainment Leasing Contract

This management contract is hereby set forth between two parties.
*Lynn Gross* DBA *Octagon Development Group and David Beasley* Owner
of The fabulous Ebonys.

## AGREEMENT:

This agreement will read as follows: Lynn Gross representing Octagon Development Group will lease the management rights of the group known as, The Fabulous Ebonys a.k.a The Ebonys from the Owner, David Beasley, and will be entitle to book and manage the group in all entertainment events for the purpose of profit. Earnings from all events will be managed, controlled and distributed by Lynn Gross, representing Octagon Development Group.

## TERMS:

This contract will last for a period of thirty-six months (36), beginning on the first day of monetary acquisition of the first of two installments.

Each of the two installments will be issued in the amount of Seventy Five Hundred Dollars (7500.00) bringing to an agreed upon total of $15,000.00.

Owner David Beasley will agree to accept the first payment of $7500.00 on or before December 1, 2004 and will accept a second payment February 5, 2005.

Owner David Beasley will agree to an extension of 25 days on the 2nd installment, if Lynn Gross DBA Octagon Development, can not produce 2nd installment of $7500.00 by February 5, 2005. This extension will be automatic, but for the sum of an additional, cost of $500.00 due to Owner David Beasley on the day of February 5th, 2005.

Lynn Gross, DBA, Octagon Development Group, Will assume all responsibilities and Liabilities for the management of the group during the 36 months lease period. David Beasley will not be held responsible or liable for any bills, debts or cancel events incurred by The Ebonys while under this lease agreement.

David Beasley
Owner The Ebonys          X _David Beasley_

                          Date _11/14/04_

Lynn Gross
Octagon Development Group X _Lynn Gross_

                          Date _11/14/04_



## David S. Beasley
## Leasing Contract

This management contract is herby set forth between Forrest Finney, Micheal Mackintosh and David S. Beasley Owner of The EBONYS Entertainment/Singing Group.

**AGREEMENT:**

This agreement read as follows: Forrest Finney & Micheal Mackintosh will lease the management rights of the group known as, The EBONYS a.k.a. The FABULOUS EBONYS from the Owner, David S. Beasley, and will be entitled to book and manage the group in all entertainments events for the purpose of profit. Earning from all events will be managed, controlled and distributed by Forrest Finney or Micheal Mackintosh.

**TERMS:**

This contract will last for a period of twelve months (12), beginning on October 1, 2007. David S. Beasley will be paid in advance the sum of Five Thousand Dollars ($5000.00.) Two Thousand Five-Hundred Dollars ($2500.00) in advance and the balance of Two Thousand Five-Hundred Dollars ($2500.00) on or before April 5, 2008.

Forrest Finney and Micheal Mackintosh will assume all responsibilities and Liabilities for the management of the group during the 12 month lease period. David S. Beasley will not be held responsible or liable for any bills, debts or cancelled events incurred by The EBONYS while under this lease agreement.

DAVID S. BEASLEY
OWNER OF THE EBONYS              x _David Beasley_

FORREST FINNEY                   x _Forrest Finney_

                                 Address _441 Stevens St_

                                 _Camden NJ, 08103_

MICHEAL MACKINTOSH               x _Michael M'Intosh_

Sworn to and subscribed         Address _5521 Willows Ave_
before me this
_ day of _Oct_, 20_07_           _Phila Pa 19143_

Notarized by: _____

Date: _Elesha M. Johnson_

                                 **ELESHA M. JOHNSON**
                                 NOTARY PUBLIC OF NEW JERSEY
                                 Commission Expires 7/25/2010

# David S. Beasley
## Leasing Contract

This management contract is hereby set forth between Forrest Finney, Michael Mackintosh and David S. Beasley, Owner of The EBONYS Entertainment/Singing Group.

## AGREEMENT:

This agreement reads as follows: Forrest Finney & Micheal Mackintosh will lease the management rights of the group known as, The EBONYS a.k.a. The FABULOUS EBONYS from the Owner, David S. Beasley and will be entitled to book and manage the group in all entertainment events for the purpose of profit. Earning from all events will be managed, controlled and distributed by Forrest Finney or Michael Mackintosh.

## TERMS:

This contract will last for a period of twelve months (12), beginning on October 1, 2007.

Forrest Finney and Micheal Mackintosh will assume all responsibilities and liabilities for the management of the group during the twelve (12) month lease period. David S. Beasley will not be held responsible or liable for any bills, debts or cancelled events incurred by The EBONYS while under this lease agreement.

_David S Beasley_
David S. Beasley
Owner of The EBONYS

Sworn to and subscribed
before me this
_ day of _Oct_, 20_0_

_____
Date

ELESHA M. JOHNSON
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 7/25/2010



1623 Third Ave, Suite 22A
New York, NY 10128
(212) 289-0096 - (212) 289-0686 Fax

**royalty**|recovery

September 14, 2010

Clarence Vaughan
728 Bentley RD
Lindenwold, NJ 08021

Dear Clarence,

Further to our discussions, I am pleased that you and your band members are considering working with Royalty Recovery, Inc. to assist you in recovering your unpaid royalties. We thank you for that consideration.

To that end, enclosed please find two (2) copies of our agreement. If it is acceptable, please have the enclosed agreements signed by each member, have the attached letters signed and notarized and return the full agreements to our office for counter signature. Please make sure that each member signs both the agreement and the attached letter.

Should you have any questions, comments, concerns, etc., regarding the agreement, please do not hesitate to contact me.

Best wishes,

Sincerely,

Jeff Gandel

September 14, 2010 Letter Agreement
from The Ebonys
To ROYALTY RECOVERY
Page 1 of 7

September 14, 2010

To:    Royalty Recovery, Inc.
       1623 Third Ave
       Suite 22A
       New York, New York 10128

From:  Clarence Vaughan, Jenny Holmes, David Beasley and James Tuten
       p/k/a The Ebonys o/b/o themselves and the artist The Ebonys
       728 Bentley RD
       Lindenwold, NJ 08021

Dear Sirs:

When co-signed by you, the following will outline the agreement between Clarence Vaughan, Jenny Holmes, David Beasley and James Tuten p/k/a The Ebonys o/b/o themselves and the artist The Ebonys ("The Ebonys") and you, Royalty Recovery, Inc. ("Royalty Recovery"):

    1. The Ebonys is entitled to certain royalties from his performances, compositions, sound recordings and publishing companies, which The Ebonys is not currently receiving (collectively, the "Claims").

    2. The Ebonys hereby appoints in perpetuity Royalty Recovery as The Ebonys' sole authorized representative with respect to all rights in and to the Claims.

    3. The Ebonys hereby authorizes Royalty Recovery to proceed, as The Ebonys' exclusive agent, with such efforts as Royalty Recovery deems reasonable and practical including, but not limited to, negotiating a resolution of The Ebonys' rights and or the Claims and/or filing an appropriate civil action in The Ebonys' name against any third party to protect The Ebonys' rights and/or the Claims.  The Ebonys hereby irrevocably appoints Royalty Recovery as The Ebonys' attorney-in-fact for all matters relating to this agreement and in The Ebonys' name and to execute and deliver any documents and/or otherwise that Royalty Recovery may deem necessary. If Royalty Recovery determines that there are no other Claims to pursue or that the pursuit of certain Claims is not economically justifiable, it will notify you and this agreement will terminate with respect to those Claims not pursued.  The aforementioned contract termination will not affect the rights of Royalty Recovery with respect to the Claims it has pursued, or is in the process of pursuing.

    4. The Ebonys hereby grants to Royalty Recovery the sole and exclusive rights in perpetuity:

    a) the right to collect any and all royalties, fees, expenses or other income currently due or becoming due, except for all royalties, fees, expenses or other income which are currently being paid to The Ebonys.

September 14, 2010 Letter Agreement
from The Ebonys
To ROYALTY RECOVERY
Page 6 of 7

David Beasley o/b/o himself and his interest in the recording artist p/k/a The Ebonys
c/o Royalty Recovery, Inc.
1623 Third Ave, Suite 22A
New York, NY 10128

Dated as of September 14, 2010

Re:      **Payment to David Beasley and his interest in the recording artist p/k/a The Ebonys**

Ladies and Gentlemen:

1.      I have hired Royalty Recovery, Inc. ("Administrator") to administrate my rights, including but not limited to my compositions, my sound recordings, my recorded performances, all of my productions, all of my publishing companies and all of my record labels.

2.      Although I have previously entered into agreements which would require you to pay me directly, for the services which I rendered, I hereby request and irrevocably authorize you to make all payments due to me, as follows:

(i)      All checks and statements shall be sent to Royalty Recovery, Inc. 1623 Third Ave, Suite 22A, New York, NY 10128 or their then current address.

(ii)     All checks shall be made payable to Royalty Recovery, Inc.

Very truly yours,

*David Beasley*

David Beasley

STATE OF *New Jersey* )
                            ) ss.:
COUNTY OF *Camden* )

On *23 September 2010*                         before me, the undersigned, personally appeared
*David Beasley*                         personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/his/their capacity(ies), and that by his/his/their signature(s) on the instrument, the person(s) or the entity on behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Notary Public





**Philadelphia International Records**

August 19, 2013

RE: **Artist Royalty Statements for PE 6/30/13**

Dear Royalty Recipient,

Enclosed please find the Artist Royalty Statement for *Period Ending June 30, 2013.*

For any further questions please feel free to give us a call at 215-985-0900 ext. 200.

Sincerely,
Royalty Administration

PHILADELPHIA INTERNATIONAL RECORDS
309 SOUTH BROAD STREET
PHILADELPHIA, PA 19107
ROYALTY STATEMENT FOR THE PERIOD ENDING JUNE 30, 2013

ROYALTOR NAME:                    **THE EBONYS**

PRIOR BALANCE

PAYMENTS

RESERVES RESTORED

OPENING BALANCE

EARNINGS

SALES-DOMESTIC
DEMON
DEMON
OTHER USES
SONY #46635003
SONY #46635052



TOTAL EARNINGS

BALANCE

RESERVES

CLOSING BALANCE

**THE EBONYS**
c/o DAVID BEASLEY
1801 LAUREL ROAD
LINDENWOLD, NJ 08021





**EXHIBIT D**

**David S. Beasley Motion and Brief in Support of Cancellation**

**Cancellation No. 92057071**

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| | |
|---|---|
| ESTTA Tracking number: | **ESTTA606210** |
| Filing date: | **05/26/2014** |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 92057071 |
| Party | Plaintiff<br>David S. Beasley |
| Correspondence Address | DAVID S BEASLEY<br>1801 LAUREL ROAD, UNIT 612<br>LINDENWOLD, NJ 08021<br>UNITED STATES<br>dbea856005@aol.com |
| Submission | Opposition/Response to Motion |
| Filer's Name | David S. Beasley |
| Filer's e-mail | dbea856005@aol.com |
| Signature | /David S Beasley/ |
| Date | 05/26/2014 |
| Attachments | MIS5_26_14.pdf(510720 bytes )<br>GAMBLE.pdf(191329 bytes ) |

IN THE UNITED STATES PATENT AND TRADEARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


In the Matter of trademark Registration No. 4170469

Cancellation No. 92057071                              )


<u>Defendant</u>                                        )
William H. Howard dba The Ebonys
                                                       )
            v

<u>Plaintiff</u>                                        )
David S. Beasley


**<u>MOTION TO CANCEL TRADEMAKE REGRISTRATION ON THE GROUNDS OF FRAUD</u>**

- Fraud in procuring a trademark registration occurs when an applicant knowingly makes false,

  material representations of  fact in connection with the trademark application.


he bases for this Motion are set forth in the in the accompanying Memorandum. Plaintiff,  David S.

Beasley hereby move this court to cancel Registration #4170469.


                                        Dated this 26th day of May, 2014



<u>CERTIFICATE OF SERVICE</u>
I hereby certify that a true and accurate copy of the forgoing (Memorandum in Support Motion to
Cancel Registration) has been served on May 26, 2014, via email to William Howard, 104 S Glenwood
Avenue, Aldan, PA   19018-4016 at the following email address:  whoward123@comcast.net

                                        By: *David Beasley*

IN THE UNITED STATES PATENT AND TRADEARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD


In the Matter of trademark Registration No. 4170469

For the Mark: The Ebonys

| | | |
|---|---|---|
| <u>Defendant</u> | ) | |
| William H. Howard dba The Ebonys | ) | **MEMORANDUM IN SUPPORT** |
| v | | |
| <u>Plaintiff</u> | ) | **OF MOTION TO CANCEL** |
| David S. Beasley | | |
| Cancellation No. 92057071 | ) | |

**FACTS**

Defendant, William Howard submitted an application for a Service Mark for Good and Services  in the name of "The Ebonys".


**ARGUMENT**

1. The Ebonys were formed in 1969 by David Beasley/plaintiff and consist of four vocalists

including himself; James Tuten (deceased) Clarence Vaughn and Jennifer Holmes.

2.  The Ebonys were officially signed with Assorted Music Records dba Philadelphia International

Records in January 1971 and continue to receive quarterly royalty statements.

3.  Defendant "William Howard"  was not and is not an original member or performed on any

original live recordings of The Ebonys singing/performing group.

4.  David Beasley/ plaintiff registered "The Ebonys" with the State of New Jersey as Class 041 in

1997 with a twelve (12) day lapse in 2013 due to mail processing.  (Mark Reg. # 21286)

5. David Beasley/ plaintiff continues to manage goods and services involving the name "The

Ebonys".  David Beasley/ plaintiff manages entertainment services   in the nature of live

performances by vocalist; entertainment in the nature of vocal music groups; and live performances

by musical groups.

6.  David Beasley/ plaintiff never relinquished in writing or verbally his rights of the "The Ebonys"

name to defendant, any other individual and/or  group to provide profit to themselves for services

or goods.

7.  David Beasley/ petitioner continues with on-going projects as an original member/owner

of  the "The Ebonys" name.

8.  David Beasley/ petitioner continues to acknowledge and receive all correspondence as it relates

to royalty statements and W-9 IRS form as required for "The Ebonys".

9.  Kenneth Gamble, Chairman/President of Philadelphia International Records confirms "The

Ebonys" name was derived by David Beasley/ petitioner personally. (Letter attached)


**CONCLUSION**

 For the reasons stated above, Plaintiff's Motion to Cancel Registration #41704698 request should be
granted.

<div align="right">Dated this 25th day of May, 2014</div>


<div align="center">CERTIFICATE OF SERVICE</div>

I hereby certify that a true and accurate copy of the forgoing (Memorandum in Support Motion to
Cancel Registration) has been served on May 26, 2014, via email to William Howard, 104 S Glenwood
Avenue, Aldan, PA   19018-4016 at the following email address:   whoward123@comcast.net

<div align="right">By: David Beasley</div>



**Philadelphia International Records**

May 12, 2014

Mr. David Beasley
The Ebonys
1801 Laurel Road – Unit 612
Lindenwold, NJ 08021

**Re: The Ebonys**

Dear Mr. David Beasley:

As per your request and my recollection I am confirming that the name "The Ebonys" was derive by you personally. In addition I am also reconfirming that Mr. Billy Howard was not apart of the original group and was not apart of any productions or studio recordings made with the group while you were with Philadelphia International Records.

We hope this will be of assistance to you regarding your business matters with the group and it's pertinent naming rights.

If we can be of further assistance to you, please contact us at the office

Sincerely,

Kenneth Gamble
Chairman/President
Philadelphia International Records



**Philadelphia
International
Records**

March 3, 2014

Dear Royalty Participant:

Please note that the Philadelphia International Records Music Catalog has been officially acquired by Sony Music Entertainment. As a result, Sony Music in the future will be handling and processing your royalty statements starting this year. Therefore, please note that **PIR's Period Ending June 30, 2014 Royalty Statement Accounting will be the final accounting** rendered to you by Philadelphia International Records. **Any future statements will be issued by Sony Music Entertainment.**

In the coming months we will be providing to you additional pertinent contact information regarding future communications with Sony Music Entertainment's Royalty Division.

Also please note as we update our records to facilitate a smooth transition, please find attached a W-9 form for you to complete and mail back to us at the address below or via email at **royalty@gamble-huffmusic.com**. This process will also allow Sony to continue issuing accurate name, address and tax id information related to your ongoing Period Ending Royalty Statements.

The PIR Organization is very excited about this historic move and is confident that it will be a benefit to all participants in the music catalog.

On behalf of Philadelphia International Records, Messrs. Kenneth Gamble and Leon Huff, our Executive Office and our Royalty Team, we thank you for being a part of the PIR Family and the great and historic "Sound of Philadelphia" Catalog.

Sincerely,
Royalty Administration

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)

DAVID BEASLEY

Business name/disregarded entity name, if different from above

THE EBONY'S

Check appropriate box for federal tax classification:

[X] Individual/sole proprietor    [ ] C Corporation    [ ] S Corporation    [ ] Partnership    [ ] Trust/estate

[ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

[ ] Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting
code (if any) _____

Address (number, street, and apt. or suite no.)

1801 LAUREL ROAD UNIT 612

City, state, and ZIP code

LINDENWOLD, NJ 08021

Requester's name and address (optional)

List account number(s) here (optional)

*Print or type*
*See Specific Instructions on page 2.*

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

1 4 4 – 4 0 – 1 3 3 7

Employer identification number

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign
Here

Signature of
U.S. person ▶ *David D Beasley*

Date ▶ 3-17-14

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X      Form **W-9** (Rev. 8-2013)

**EXHIBIT E**

**David S. Beasley's  Final Brief**

**Cancellation No. 92057071**

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| | |
|---|---|
| ESTTA Tracking number: | **ESTTA624503** |
| Filing date: | **09/01/2014** |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 92057071 |
| Party | Plaintiff<br>David S. Beasley |
| Correspondence Address | DAVID S BEASLEY<br>1801 LAUREL ROAD, UNIT 612<br>LINDENWOLD, NJ 08021<br>UNITED STATES<br>dbea856005@aol.com |
| Submission | Brief on Merits for Plaintiff |
| Filer's Name | David S. Beasley |
| Filer's e-mail | dbea856005@aol.com |
| Signature | /David S. Beasley/ |
| Date | 09/01/2014 |
| Attachments | petition for cancellation9_1_14.pdf(672882 bytes )<br>9_1_14SUPPORTDOC.pdf(124809 bytes ) |

"IN THE UNITED STATES PATENT AND TRADEARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD,"

In the Matter of trademark Registration No. 4,170,469

For the Mark: The Ebonys

<u>Petitioner</u>
David S. Beasley
1801 Laurel Road Unit 612
Lindenwold, NJ   08021

        V.

<u>Registrant</u>
William H. Howard
104 S. Glenwood Avenue
Aldan, PA  19018-4016

Cancellation No. 92057071

**AMENDED PETITION TO CANCEL A TRADEMARK REGRISTRATION.**

David Beasley the petitioner believes that he will be damaged by the above-identified registration,

and hereby petitions to cancel the same.

The Grounds for Cancellation are as follows:

<p align="center"><u>Fraud</u></p>

- *Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with the trademark application.*

<p align="center"><u>Facts</u></p>

Defendant, William Howard submitted an application for a Service Mark for Good and Services  in the name of "The Ebonys"

1. William Howard the registrant has known David Beasley the petitioner more than thirty-five year

and did knowingly apply for a trademark registration making false material representations.

2. The Ebonys were formed in 1969 by David Beasley/petitioner and consist of three vocalists

including himself; James Tuten (deceased) Clarence Vaughn and Jennifer Holmes.

3.  The Ebonys were officially signed with Assorted Music Records dba Philadelphia International

Records in January 1971   David Beasley/petitioner receives quarterly royalty statements and all

correspondence for distribution to original members.

4.  Registrant was not and is not an original member or performed on any original live recordings of

 The Ebonys singing/performing group.

5.  David Beasley/petitioner registered "The Ebonys" trademark with the State of New Jersey as

Class 041 in 1997 and continues to maintain its current status.

6.  David Beasley/petitioner continues to manage goods and services as "The Ebonys".  David

Beasley/petitioner manages entertainment services  in the nature of live performances by vocalist;

entertainment in the nature of vocal music groups; and live performances by musical groups. David

Beasley/petitioner continues with on-going projects as the creator and original member/owner of

the "The Ebonys" name.

7.  David Beasley/petitioner never relinquished to William Howard/registrant in writing or

verbally the rights of the "The Ebonys" name; or to any other individual and/or group .to provide

profit to themselves for services or goods.

**CONCLUSION**

 For the reasons stated above, Petitioner Motion to Cancel Registration #41704698 request should be
granted.

By: <u>David S. Beasley</u>                                  Date:  <u>September 1, 2014</u>
      Petitioner

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the forgoing has been served on September 1, 2014, via email to William Howard, 104 S Glenwood Avenue, Aldan, PA   19018-4016 at the following email address:  whoward123@comcast.net

By: <u>*David S. Beasley*</u>

David S. Beasley



SONY MUSIC

July 2014

DAVID BEASLEY
THE EBONYS
1801 LAUREL ROAD UNIT 612
LINDENWOLD NJ  08021

Dear Royalty Participant,

Enclosed please find a copy of your December 2013 period end royalty statement.

Please be advised that if you are due royalties and currently receive a royalty payment by check, your check will be mailed separately from this royalty statement. You can also sign-up for free direct deposit of future payments into any U.S. bank account. This form can be downloaded at http://hub.sonymusic.com/royaltyinformation/docs/ach.pdf.

If you have any questions, please contact the Sony Music Entertainment Royalty Helpdesk at the contact information provided below.

Kind Regards,

**SONY MUSIC ENTERTAINMENT**

| | |
|---|---|
| **Contact** | **: Royalty Department** |
| Email | : royalty.statements@sonymusic.com |
| Telephone | : 1 201 777 3448 |
| Fax | : 1 201 777 3047 |



**Philadelphia
International
Records**

May 24, 2014

Mr. David Beasley
The Ebonys
1801 Laurel Road – Unit 612
Lindenwold, NJ 08021

Dear Mr. Beasley,

In 2004, the Phillies honored Kenneth Gamble and Leon Huff for their legendary work in the music industry, as well as their overall contribution to the City of Philadelphia. During the 2004 Sound of Philadelphia celebration, we established an annual award in their honor: **The Phillies Gamble and Huff Community Partnership Award.** Past honorees include Teddy Pendergrass, Patti Labelle, Boyz II Men, The Delfonics, Jerry Butler, Dee Dee Sharp, and Chubby Checker.

This year we are pleased to announce that we will be honoring **you as a member of the Legendary The Ebonys, The Three Degrees, Bob Pantano – 98.1 WOGL Radio, Lois Fernandez – Founder and Creator of ODUNDE, Inc**. with the 2014 Phillies Gamble and Huff Community Partnership Award for your endless dedication and generosity in your hometown of Philadelphia. This year the celebration, formerly known as The Sound of Philadelphia Celebration, will be a part of the **African American Heritage Night – Presented by The Sound of Philadelphia and Gamble and Huff.** We are asking each honoree to perform one or two songs on the field as part of the awards ceremony. **Honorees will need to provide their own tracks.** The award will then be presented on-field by Mr. Gamble and Mr. Huff along with a member of the Phillies team.

The celebration will take place on **Wednesday June 25, 2014**. It is also, in part, a celebration of Black Music Month. This event is a blending of two of America's favorite obsessions – baseball and music.
Below are the details and times for the event:

**Location:**
- Citizens Bank Park – On Field
- Philadelphia, PA

**Date and Time:**
- Wednesday June 25, 2014
- Approx 5:45 p.m.

**Sound Check Time/Rehearsal Times:**
*To be determined by project coordinators Tony Kauffman and Gwen Gamble.*

**Promotion**
Please note that honorees may be asked to assist in promoting the event through radio and television interviews.

**Tickets**
Each honoree will be given a small limited number suite tickets to use for their own guests. **The names of guests must be given to us prior to the game as there will be a VIP list of persons allowed into the suite.**

A detailed itinerary will be sent to you by June 16, 2014. If there are any questions, please feel free to contact G̶~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

We hope you accept this honor and we look forward to celebrating with you!

Warmest Regards,

Charles B. Gamble
Executive Vice President
Philadelphia International Records